## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**PAMELA BRAUD, ET AL**                    **CIVIL ACTION**

**VERSUS**                                 **NO. 05-1898 (all consolidated cases)**

**TRANSPORT SERVICES OF ILLINOIS**         **DIVISION (3)**
**and JEROME HOLMES**                      **28 U.S.C. § 636 ( c )**

### MEMORANDUM RULING

Daniel E. Knowles, III, Magistrate Judge.

On September 30, 2008, this case came on for bench trial solely on the issues of: (1) the vicarious liability, if any, of defendant, Transport Services of Illinois ("Transport "),[1] for the alleged negligence of its truck driver, defendant Jerome Holmes ("Holmes"); and (2) Transport Services' affirmative defense of third party fault - *i.e.*,that first responders (NOPD/NOFD) to the incident involving the chemical spill in a residential area allegedly overreacted to the danger by calling for an evacuation of a ½ mile radius, *inter alia*.  These consolidated cases involve a putative class comprised of residents of Algiers, Louisiana, who were  evacuated from their residences following the incident involving Transport Services' tanker loaded with the hazardous chemical, Monoethanolomine, which overturned while parked overnight at a strip mall located at 4800 General Meyer Avenue in Algiers. The parties presented contemporaneous evidence on the aforesaid issues; thereafter the matter was submitted for determination. Having considered all of the foregoing, the Court hereby enters the following findings of fact and conclusions of law.  To

---

[1]Transport is a tank truck carrier with its principal place of business in Hinsdale, Illinois.

1

the extent that any of the findings of fact constitute conclusions of law and vice versa, they are so adopted.

## I. CONTENTIONS OF THE PARTIES

### Vicarious Liability: "Course and Scope" under La. Civ. Code Art. 2320

Transport contends that it is not vicariously liable for the actions of Holmes after he left the facility on August 18, 2004  because his misconduct constituted a "flagrant" violation of company rules.  In this regard, Transport details the violations, including detaching Transport's loaded tanker, leaving it unattended in an Algiers' neighborhood strip mall and going home two blocks away in Transport's tractor to sleep for the night.   Essentially, Transport's position is that Holmes's course of action constitutes such a gross deviation from duty that it was tantamount to the abandonment of his load/delivery assignment.  In this regard, Transport characterizes Holmes's transgressions as purely personal, in that his conduct was not reasonably incidental to the performance of his duties and did not benefit Transport or further its interests.

Plaintiffs and Holmes counter that he was acting within the "course and scope" of his employment at all pertinent times.  Even assuming *arguendo* that Holmes violated several company rules, both Holmes and Plaintiffs argue that he did so in order to satisfy another company rule – *i.e.*, a minimum of 8 hours off duty (mandatory rest) must follow a period of 15 hours on duty.   In this regard, plaintiffs highlight that Holmes had not slept in 24 hours before leaving the Port Allen/Plaquemines terminal on August 18th, 2004.

Plaintiffs highlight Holmes's uncontroverted deposition testimony regarding the events leading up to his departure from Port Allen.   More specifically, Holmes reported for duty on August 17th at 7:30 A.M. but was detained for the reasons that: (1) his regular truck was

undergoing repairs; (2) the first truck provided was inoperable; (3) the second truck provided by Transport overheated,  had to be returned to the facility and could not be repaired onsite; (4) Holmes had to await the arrival of another truck from the Geismar facility on August 18th, 2004; and (5) for reasons beyond his control he could not commence his delivery course until after 10:00 p.m. on that date.

Plaintiffs and Holmes himself contend that his conduct was motivated in significant part by his effort to satisfy a duty owed to Transport and thus he was at all times within the course and scope of his employment.  In other words, their position is that parking his load in an unauthorized location late at night on August 18th during his driving assignment was so closely connected in time, place and causation to his employment duties that such should be regarded as a risk fairly attributable to the employer's business.  Plaintiffs argue that Holmes had the responsibility of completing the long distance haul of Transport's tanker loaded with MEA at all pertinent times and that the mandatory rest stop was within the course and scope of that work/delivery assignment (despite his lapse in judgment).

### Affirmative Defense: Third Party Fault

Transport and Holmes contend that the post-incident response by the New Orleans Fire Department ("NOFD") and/or the New Orleans Police Department ("NOPD") was an "overreaction."  More specifically, they submit that the evacuation of residents within a half mile radius of the overturned load *contra* the recommendation of the HAZMAT experts on the scene was overblown and unnecessary.  Under the circumstances, defendants contend that they should not be held responsible for the evacuation because air monitor readings showed that the only detectable findings were within six inches of the overturned tanker.  Moreover, defendants

contend that first responders applied an inappropriate response protocol, including a half-mile radius evacuation in an incident which did not involve either fire or an explosion and deployment of the Intrado alert system (the "reverse 911 protocol").

Plaintiffs counter that first responders onsite were correct in preparing for a worst case scenario. In this regard, plaintiffs highlight that the NOFD and NOPD did not know whether the container would maintain a stable heavy drip or rupture and dump its contents. Regarding the DOT Emergency Response Guidebook, plaintiffs submit that it merely provides guidelines to assist first responders in making their *initial* assessment. Plaintiffs argue that there is no substitute for emergency response training, knowledge or sound judgment. Considering the unknown factors including the condition of the tanker and a threatening storm cell moving in the direction of the site, plaintiffs submit that the first responders appropriately erred on the side of caution. In sum, plaintiffs contend that this spill occurred in an urban community setting, the response was justifiable and, in retrospect, it cannot be characterized as a "negligent overreaction" simply because the tanker was eventually successfully righted without further incident.

## II. FINDINGS OF FACT

This Court's current exposition of the facts is limited to those relevant to the disposition of the issues of vicarious liability of Transport and third party fault of first responders, NOPD and NOFD. Accordingly, the material events are those which involve the business of Transport, its employment of defendant driver Holmes and his dispatch after 10:00 p.m. on August 18, 2004 from Transport's Port Allen/Plaquemines terminal with a 46,500 pound load of Monoethanolomine (MEA) bound for Sumter, South Carolina. Additionally, the first

4

responder's assessment and response to Transport's overturned tanker in the strip shopping mall

on Gen. Meyer Ave. in Algiers, Louisiana is also the subject of this Court's findings.

**Facts Relevant to the Determination of   "Course and Scope"**

Transport is one of the largest tank truck carriers in the United States, in the business of

the transportation of hazardous chemicals and food products to customers all over the United

States and Canada.[2]  Transport provides the trucks and tankers used by its company drivers, who

are employed in the traditional sense to carry loads of hazardous chemicals.[3]  All company

drivers attend a two week course which includes both classroom and hands on training in

Transport's home office in Illinois.[4]  Additionally, upon returning to their respective assigned

terminals, company driver trainees' instruction continues for a period of weeks accompanied by

Transport's "road tester/instructor"  until the terminal manager is satisfied that the driver is

fluent with all aspects of all of the various types of delivery to which a Transport Company

driver may be assigned.[5]

In June of 2004, Holmes began training for the position of truck driver with Transport.[6]

On July 9, 2004, Holmes ceased being a trainee and became a full time employee of Transport.[7]

---

[2]Trial Testimony of Linda Willson, manager of Transport's Port Allen/Plaquemines terminal.

[3]*Id.*

[4]*Id.*

[5]*Id.*

[6]*See* Jerome Holmes' Personnel File (Exh. 11/DEF 99-178); Holmes' Deposition at p. 272; Trial Testimony of Linda Willson.

[7]Holmes Deposition at pp. 23-25, 27 (After a one-month basic operations course on tankers in Illinois, Holmes was assigned to Transport's Port Allen terminal/truck yard as a

5

*In addition to an hourly rate*, Transport also paid him by the mile.  Moving/driving Transport's truck/tanker rigs cross country on long distance delivery assignments, including rest stops, was an essential part of Holmes' job duties.[8]

Holmes reported for work at Transport's Port Allen terminal at approximately 7:30 a.m. on August 17, 2004.[9]  Upon his arrival, Holmes learned that his regular truck was still undergoing repairs and was not available for the assigned long distance haul to Sumter, South Carolina.[10]  The second truck assigned for the MEA haul broke down in the yard; the third truck overheated and Holmes had to return to the Port Allen terminal.  Holmes had to wait until the next day [August 18, 2004] for Transport to pick up a truck from the Geismar yard; he stayed overnight at the Port Allen/Plaquemines terminal awaiting the arrival of another truck.[11]  Holmes was finally dispatched from the Port Allen terminal at approximately 10:30 p.m. on August 18, 2004 and he headed east toward Sumter, S.C.[12]

driver).

[8]Holmes' Personnel File, Company Driver Payroll History re Jerome Holmes [Exh. "11"/DEF 49]; Holmes' Deposition at p. 28.

[9]Holmes Deposition at pp. 54, 61 ("I got there that morning the day before [August 18, 2004] as a matter of fact.  It had been the whole day I stayed in the yard.  I went through – that particular morning it was actually one, two, three – four trucks before I got a – a working truck to deliver the load.  So, I started from that  – that morning [August 17, 2004] until the next – that went the whole 24 hours plus the next night...."); Scale Weight Ticket destination Sumter, S.C. ("Out: 10:00 08/18/2004 ") [Exh. 12/DEF 827]; Transport Manifest (same) [Exh 13/DEF 823].

[10]Holmes Deposition at p. 62 ("My truck was still in the shop when I turned it in for my two days leave.  When I go back it was still in the shop.  It wasn't ready.").

[11]Holmes Deposition at pp. 63-64, 253-255 (Holmes testified that he stayed up all night in the "broke truck" because it was "burning up hot and the mosquitos were biting all night").

[12]Holmes Deposition at pp. 64, 256-257 (Holmes testified that, at the time he finally left the second day, he had not slept for over 24 hours and the people at Port Allen terminal knew it

Holmes's load was a tanker full of Monoethanolomine (MEA), a form of concentrated soap.[13]  It is a corrosive chemical and exposure can cause irritation of the eyes and mucous membranes of the nose and mouth.  Acute overexposure can cause blindness, respiratory emergency and death.  Had the MEA spill been more significant and/or vaporized due to rain, a large area surrounding the tanker could have been affected.[14]  Defendant's dispersion expert Steven A. Stage, Ph.D., classified the risk as an extremely low risk of hazard *after-the-fact* based upon the estimates of spilled MEA utilizing a conservative calculation.[15]

Transport's 15 Hours of Service Time rule comports with the corresponding federal regulations, to wit: "No driver may <u>drive</u> after 15 hours <u>on duty</u>.  A *minimum* of 8 hours off duty must follow the 15 hour on duty period."[16]  Additionally, Transport's 10 Hours Driving Time rule provides: "No driver shall drive for more than 10 hours.  A minimum of 8 hours off duty must follow the 10 hour driving period."[17]

Holmes would not have been reimbursed for the expense of a hotel on the night of August 18, 2008.[18]  He was paid to operate Transport's trucks at the rate of $0.38 per mile *plus a*

--------

because they were right there with him).

[13]Holmes Deposition at pp. 77, 261.

[14]*See* Material Safety Data Sheet [Exh. 5/DEF 810]; DOT Emergency Response Guidebook [Exh. 6]; Deposition of Gordon Goldman at pp. 22-26.

[15]*See* Trial Testimony of Steven A. Stage, Ph.D.

[16]Transport's Driver Operation Manual, Sec. 395.3 (underlining emphasis in original and italicized emphasis added) [Exh. 10/DEF 836].

[17]*Id.,* at Sec. 395.3(a) & 395.10.

[18]Trial Testimony of Linda Willson.

*salary*.  Holmes was not compensated for the following: (1) time spent loading and unloading tanks; (2) time spent maintaining or cleaning Transport's trucks; (3) hotel accommodations (unless he was on the road for five days or more continuously); (4) meals en route to an assigned destination; or (5) necessary standby or "down time" in the service of Transport.[19]  Holmes was provided a credit card to purchase fuel.[20]

Prior to leaving the terminal on assignment, Holmes was required to prepare his own "basic plan of rest, meal, fuel and tire check stops."[21]  After leaving the Port Allen terminal, Holmes headed east on Interstate 10.  His planned route was to take that interstate as far east as Interstate 59 north and to Interstate 20 east.[22]  His route was not specified by Transport; routes are left to the discretion of the driver.[23]  Once he reached New Orleans, Holmes exited toward the Crescent City Connection to the Westbank, with the intention of getting some sleep at home.[24]

Holmes had spent the night of August 17, 2004 at Transport's Port Allen terminal awaiting the arrival of an operable tractor/tanker rig.   He did not depart with his tanker loaded with MEA until after 10:00 P.M. on August 18, 2004.[25]   Holmes could not have made the haul

---

[19]Transport's Driver Operation Manual, Section IX "Maintenance" and Section X "Payroll" [Exh.10/DEF 933, 935, 938, 951-957]; Holmes Deposition at pp. 28-29, 34-35.

[20]Trial Testimony of Linda Willson.

[21]Transport's Driver Operations Manual [Exh. 10/DEF 838].

[22]Holmes Deposition at p. 66.

[23]*Id*. at p 66; Trial Testimony of Linda Willson.

[24]Holmes Deposition at p. 69.

[25]*See* Transport Manifest [Exh. 13/DEF-823].

to South Carolina without at least two 8 hour rest periods.[26]  Sometime after 11:00 P.M. on

August 18, 2004, Holmes's 15 service hours (on duty) were exhausted.[27]

Holmes's residence was located in Algiers, Louisiana, approximately two blocks away

from the strip shop mall located at 4800 Gen. Meyer Avenue, where he unhitched and parked the

tanker for the night.  Albeit uncorroborated by any independent evidence, Holmes testified that

he had done this approximately three times prior to the incident in question.  However, on his

trip log he had generically marked the location of these prior rest stops as New Orleans.[28]

Holmes testified that he was in the process of applying for a Transport permit that would allow

him to park a Transport tractor and unloaded tanker at his home.  However, he had not yet

completed the application form but had in fact submitted pictures of the proposed home parking

location to Transport's terminal manager, Linda Willson.[29]  Because Holmes had not submitted

the completed application, Willson did not consider his request for a home parking permit as

"pending."[30]

Transport had a program that allowed for a home-based operation, but a permit was

---

[26]Holmes Deposition at p. 279 (Holmes would not make the haul on time.); Testimony of Linda Willson (agreeing that the load was delayed and that it would be necessary for Holmes to take two rest stops en route to Sumter, S.C.); Bill of Lading printed 8/18/2004 at 16:07:02 (noting the requested delivery date of 8/19/2004) [Exh. 14/DEF 821].

[27]Holmes Deposition at pp. 65, 266 ("I needed to have sleep.").

[28]*Id.* at pp. 69-71, 81, 121-123 and 272-273.

[29]*Id*. at pp. 231-233, 336; Trial Testimony of Linda Willson (testifying that Holmes' application was not considered pending until he submitted the written application form in addition to the pictures of the proposed parking location).

[30]*See* Trial Testimony of Linda Willson; Tractor Security Acknowledgment [Exh. 9/DEF 155].

required to park a tractor-trailer rig at home.[31]  Upon his departure, Holmes did not notify

Transport's dispatcher that he was taking the loaded tractor-trailer to his neighborhood for his 8-

hour rest stop.[32]

Transport's vehicles, including the tractor/tanker rigs operated by Holmes, were equipped

with a Qualcomm system.  That satellite communications device allowed Transport's Port Allen

or Geismar terminal dispatchers to both contact its company drivers and to monitor progress of

the delivery to any of its intrastate or interstate customers.[33]  Transport's Driver Operations

Manual describes the satellite communications systems installed in its tractors.  The system

enabled Transport to respond to customer inquiries, to communicate with their drivers instantly

and permitted drivers to communicate with the dispatcher.[34]

Albeit not as technologically sophisticated or precise as a Global Position System

("GPS"), the Qualcomm System installed in the cab of all of Transport's tractors is capable of

transmitting the position of a company driver.  The exemplar presented in court amply

demonstrated that capability – *i.e*., monitoring the position/status of the tractor trailer rig in

addition to communication with the company driver en route.  The computerized data screen

print out shows whether the ignition of a particular vehicle is on or off and roughly indicates the

position of the unit – *i.e*., 15.6 mi. n/w of Saginaw, Michigan.  Said position can be

---

[31]Holmes Deposition at pp. 123-124.

[32]Holmes Deposition at pp. 258-259.

[33]Testimony of Linda Willson.

[34]*See* Transport's Driver Operations Manual [Exh. 10/DEF 904A-909]

10

updated/refreshed  with a stroke of the  "F7" key.[35]

Company road trainer, Milton Thomas, was obviously aware of Transport dispatchers' ability to monitor the position/movement of any company driver en route to a delivery destination.  Thomas recommended to Linda Willson that Holmes's progress from loading point to delivery be monitored closely, to wit:

> I strongly recommend that the dispatcher monitor [Holmes's] load/delivery times. I stayed in the hotel with Mr. Holmes for 5 nights and had to awake him 2 to 3 times every morning.  He is not motivated, lacks initiative, and I also question his loyalty/integrity.  He never prove[d] to me that he can get out of bed on his own.[36]

Holmes knew that it was against company policy to park his loaded tanker anywhere but at a truck stop.  Nevertheless, his basic plan was to head east, stop at home, get some rest and resume his journey to Sumter in the morning (August 19, 2008).  Holmes had not requested clearance to leave his trailer overnight from the shop owners in the strip mall, where he detached and parked the tanker.  Holmes simply assumed that he had their permission, stating that he knew all of them and that he had done this before.  Holmes did in fact return in his tractor the next morning, arriving at or about the same time as the police;[37] the only shop open was the dry cleaners and there were no people outside in the strip mall parking lot.[38]

It is not disputed by any of the parties that Holmes' conduct in detaching his loaded

---

[35]Testimony of Linda Willson on cross-examination; Transport's Driver Operations Manual, Section IV(I) "Satellite Communications" [Exh 10/DEF 904A-907].

[36]Holmes Personnel File, TSC Road Instructor's Daily Driver Safety Evaluation dated July 17, 2004 [Exh. 11/DEF 97].

[37]Holmes Deposition at pp. 85, 89, 94, 100 and 104.  *See also* Louisiana State Policy Hazardous Materials Incident Report [Exh. 17/p. 002].

[38]Holmes Deposition at pp. 85, 88-90 and 94.

tanker and parking it overnight unattended in a strip mall was against company rules.  It is also uncontroverted that Holmes was never permitted by Transport to park his tractor at his home in Algiers, Louisiana.[39]  Nevertheless, it clear that Holmes made a necessary rest stop for a period of at least 8 hours as required by Transport's 15 Hour Service Rule and by federal regulations. Holmes's 8 hour rest period, which commenced sometime between 11:00 p.m. on August 18, 2004 and 1:00 a.m. on August 19, 2004, was an essential part of his duty as a company driver on a tour of duty as a Transport long distance company driver.

The undisputed facts that Holmes knowingly transgressed certain company rules by detaching the tanker, parking Transport's tractor at home without a Transport permit and also parking Transport's loaded tanker in an unauthorized location does not constitute a deviation or an abandonment of his delivery assignment based upon the specific facts and circumstances of this case.  Holmes's purpose was not folly, nor was it recreation-related or frolic of any kind. His intention was to comply with his obligation under company rules and federal law to obtain needed rest for the completion of his long distance tour of duty.[40]  There is not a shred of evidence that Holmes engaged in any activity other than acquiring the necessary rest at home before returning to his tanker two blocks away to resume hauling assignment in the morning.

Transport did not dispute that Holmes was on duty since approximately 8:00 a.m. on the morning of August 18, 2004.  It is also undisputed that his delivery did not commence until after

---

[39]Holmes Deposition at p. 229; Testimony of Linda Willson.

[40]Holmes Deposition at p. 84-85 (stating that "I was tired," "I wanted to hurry up and get [some] sleep," "I didn't get up 'til 7:00 [a.m. on August 19, 2004]," and, when he got back to parking lot, "the tanker was on [its] side").

10:00 p.m. that night.[41]  Willson admitted that Holmes's delivery assignment would have required at least two rest stops en route to Transport's customer in Sumpter, South Carolina.[42]

Most notably, Transport's Driver Operations Manual specifically provides:

"A delivery consists of the driver's entire tour of duty, from the time he/she reports to the terminal for dispatch until the time he/she returns and submits the paperwork.   Intra-plant transfers do not qualify; *actual road movement between origin and destination must occur.*"[43]

Holmes had made some progress ("actual road movement") on *his* course from Transport's Port Allen terminal to his destination. His first rest stop was his home in Algiers, Louisiana, only two blocks from the unauthorized strip mall parking area in question where he detached his tanker.  On returning to pick up his load, Holmes discovered that his tanker had overturned in the interim; there is no evidence to suggest that Holmes intended that result or that he had abandoned his delivery assignment/tour of duty.

Transport's manager acknowledged that another company driver, Danny Davis ("Davis"),[44] parked his tractor/tanker in an authorized parking area (a violation of company rules).[45]  Transport was apparently notified because of area residents' reports of chemical vapors in the area within a quarter of a mile from Davis's home (where he had stopped for lunch).

---

[41]Transport Manifest [Exh 13/DEF 823]; Ineos Scale Weight Ticket [Exh. 12/DEF 827].

[42]Testimony of Linda Willson.

[43]Transport's Driver Operations Manual (emphasis added to highlight that, albeit *sub silentio*, the definition of *delivery* includes the entire *tour of duty* – meaning the entire time commencing with dispatch from the terminal until the company driver's return to the terminal <u>and</u> the submission of paperwork).

[44]*See* Transport Manifest (Driver Danny Davis/Tractor 3677/Trailer 2114) [Exh. 13/DEF 826].

[45]*See* Trial Testimony of Linda Willson on cross-examination.

Willson attempted to distinguish the Davis incident on the following bases: (1) Davis had a permit to park his tractor at home; and (2) Davis had not unhitched or detached his tanker which had already unloaded.[46]   Transport did not follow company protocol in the Davis incident and consider the company vehicle stolen or bring charges of theft regarding the Davis's tractor/tanker which was also admittedly parked in an unauthorized location.  Additionally, Transport paid for the incidental clean up cost as opposed to Transport's driver, Davis.[47]

This Court observes that, like Holmes, Davis committed a serious violation of company rules and parked his tractor *and* tanker in an unauthorized area.  Davis was not considered in that instance as having "abandoned" his tractor/tanker rig or as operating outside of the course and scope of his employment.

Willson admitted that the incident involving Davis occurred prior to Holmes's 8/19/2004 incident.[48]  Davis was not fired for the infraction of company rules or charged with the abandonment of his tractor/tanker rig, even though he left the tractor/tanker rig and went home *for lunch*.[49]  The Court notes that rest at the interval Holmes chose to sleep along his route Sumter after approximately 15 hours of service was mandated by Transport's Driver Operations Manual; the same cannot be said for Davis' *lunch* break.

### Facts Relevant to Third Party Fault of First Responders

It is undisputed that "at approximately 7:38 a.m.," the NOPD was called to the scene and

---

[46]*See id.*

[47]*See id.*

[48]*See id.*

[49]*See id.*; *see also* Transport Manifest (Driver Danny Davis/Tractor 3677/Trailer 2114) [Exh. 13/DEF 826].

the NOFD arrived shortly thereafter.[50]   Officer Duzac and Lt. Gary Gremillion arrived in their

unmarked car and found the tanker on its side along with Sgt. Villere, who had radioed in the

report.[51]  Shortly thereafter, Captain Jeffrey Reiser of the NOFD arrived.[52]  The NOFD Incident

Report quantified the amount of material spilled on the concrete parking lot surface at about

sixteen (16) ounces.[53]  Officer Duzac testified that she saw a six foot puddle, but could not

confirm whether the liquid was chemical or rainwater.[54]  Officers of the NOFD determined what

the chemical was approximately 30 minutes after Lt. Gremillion arrived.[55]

First responders were uncertain about the physical condition of the tanker.  Lt.

Gremillion described the condition of the tanker as follows:

> It was turned over on its side and it look[ed] like the cement under the two
> support things in the front and on one side with the tires in the back.... And it
> crushed the thing and turned over on its side.[56]

Fire Chief Joseph Matthews testified that Engine No. 33 may have been the first unit

dispatched to the shopping mall parking lot which was surrounded entirely by residential

---

[50]Deposition of Vicki Sessler-Duzac at p. 8 ("[I]t was about 7:30 [or] quarter to 8:00 in
the morning when [the notification] came out over the radio.... And we were only a few blocks
away, so we turned around and went directly there.").

[51]Deposition of Lt. Gary Gremillion at p. 13.

[52]Deposition of Lt. Gary Gremillion at p. 13; Deposition of Officer Vickie Sessler-Duzac
at p. 9.

[53]NOFD Incident Report [Exh. 2/DEF 7].

[54]Deposition of Sessler-Duzac at pp. 9, 27 (noting that it did not look like a tiny spill but
that she stayed 10 to 15 feet away); Deposition of Lt. Gary Gremillion at p. 16 (remembering
seeing a puddle on the ground).

[55]Deposition of Lt. Gary Gremillion at p. 25.

[56]Deposition of Lt. Gary Gremillion at pp. 14-15.

property.  In addition to an Auto Zone and several other businesses along the strip mall, Chief

Matthews identified Ace Hardware and a few other commercial properties located across the

street.[57]   He testified that the DOT 2000 Emergency Response Book [Exh. 6] is the reference

guide that the department uses in its preliminary assessment of a hazard.  He explained that the

manual identifies hazardous chemicals and their properties – *i.e.*, "it gives you an idea of how to

handle it and what the dangers of the product [are] and so forth."[58]  Chief Matthews testified that,

in this case, Guide 153 was followed.  It sets forth two determinations in case of spill, to wit: (1)

a Table of Initial Isolation and Protective Action Distances for highlighted and non-highlighted

substances; and (2) under Fire, it provides that if a tank truck is involved in a fire, isolate one-

half mile in all directions.  Chief Matthews explained the order for evacuation of a roughly one-

half mile radius as follows:

> Well, the tanker truck was overturned and there's always that potential of fire or
> explosion.  As I said, we err on the side of safety....  Initially, no, it wasn't for a
> half mile.  It was for the immediate area .... [f]rom Gen. Meyer, River Oaks,
> Patterson, Danny and Huntlee.... [T]he area was subsequently expanded by the ...
> NOPD.[59]

Chief Matthews recalled that Carol Petranek of the DEQ was on the scene performing air

---

[57]Deposition of NOFD Chief Matthews at pp. 16-17.

[58]Deposition of NOFD Chief Matthews at pp. 18-19.

[59]Deposition of NOFD Chief Matthews at pp. 49-53.  See also NOFD Incident Report by
NOFD Captain Jeffrey Reiser ("E33 responded to report of a fuel spill.  Upon arrival an
overturned tank car with [MEA] product identified by the placard #2491 in a quantity of 46,500
gallons as declared on the data sheet, was observed.  E33 made contact with the driver who
handed over the MSDS sheet identifying the product and quantity in the tank.  E33 immediately
called for completion of the alarm and HAZ-MAT to respond to the scene.  We read the DOT
2000 Emergency Response Book and followed the guidelines.  We observed a small steady drip
from the container and used Guide 153 which called for an evacuation of the immediate area.
This area was expanded to a two square block area with the assistance of N.O.P.D.  Scene turned
over to C-508 as incident commander.") [Exh 2/DEF 13].

16

monitoring tests.  All of those tests measured zero, except one taken within an inch of the product.[60]  Chief Matthews explained that those readings would not necessarily control the size of the evacuation because the tanker remained overturned at that time.  He testified that "there was still a danger posed."[61]

Captain Dabdoub of the NOPD explained the partnership with the State Police, DEQ and other agencies' personnel on the scene.  They all worked the incident in concert but NOPD retained primary responsibility to provide for the safety of the community, to control the traffic flow and other incidental matters.  NOPD's Fourth District Commander, Captain Dabdoub, testified that, ultimately, it was his responsibility and decision to recall or retract the isolation perimeter.[62]

Extra personnel were present on the scene as a precautionary measure to assist in a door-to-door evacuation of the people in the community.  This was particularly necessary in the case of persons with special needs.  Fire Chief Matthews stayed on the scene as the ranking NOFD officer.  The NOPD maintained the perimeter and had cordoned off the streets with barricades to prevent traffic from flowing into the area.[63]  Captain Dabdoub made the decision to engage the emergency notification system (Entrado) – *i.e.*, a "reverse 911 community alert system.[64]

Captain Dabdoub testified that reports about a rain cell headed towards the site weighed

---

[60]Deposition of NOFD Chief Matthews at p. 56.

[61]Deposition of NOFD Chief Matthews at pp. 56 - 57.

[62]Deposition of NOPD Captain Dabdoub at p. 31.

[63]Deposition of NOFD Chief Matthews at pp. 25- 29.

[64]*Id.* at pp. 40-41; Intrado Informed Response [Exh. 16].

heavily in his decision to activate the Entrada notification system.[65]  He further explained that,

once that particular threat subsided, he met with other agency heads and discussed the suggestion

that the evacuation area be shrunk.[66]  Captain Dabdoub made the decision to maintain the

isolation area until the tow trucks arrived.  Once the tanker was righted and they were assured

that the leak was sealed, NOPD began to break down the sealed-off area and to allow people

back into the area.[67]

Tow trucks were called to the scene to assist in righting the tanker.  It was not until

approximately 1:00 or 2:00 o'clock in the afternoon that the tanker was righted without incident

and the Level II danger had passed.[68]   Captain Dabdoub explained his emergency response

expanding the evacuation area to roughly a half mile radius of the overturned loaded chemical

tanker, as follows:

> From every bit of training, every bit of guidance, every bit of policy I would have
> ever read, been talked to or communicated with other law enforcement officers,
> lessons learned, *et cetera*, in situations similar to this, every piece of advice or
> common sense thinking would be, when in doubt, err on the side of caution and
> safety for the community you serve.  I'm sworn to do what I think can make
> everyone safe.... Everything was taken into account ... [including the report of]
> Margaret Dubuisson ... [that] a storm cell [was] headed right for you....[69]

In sum, his testimony was that an "under-reaction" would have potentially placed people in

harms way.

---

[65]Deposition of NOPD Captain Dabdoub at p. 26.

[66]*See id.,* at pp. 31-32 (noting that the situation "was still iffy" because the truck was not
righted).

[67]*Id.,* at p. 33-34.

[68] Deposition of NOFD Chief Matthews at pp. 29-30, 57.

[69]Deposition of NOPD Captain Dabdoub at pp. 54-55.

When asked about the criteria for making a determination to evacuate in the event of a chemical spill, Captain Mark Willow, who was assigned to the Homeland Security District at the time of the August 19, 2004, commented:

> [O]bviously, you can't write a rule book for every single thing and you've got to use your best judgment at the time.... [I]f you've got a big tank truck and you think there might be something in there, obviously, I would – me personally, I would rather say let's evacuate this area, especially if there's not a fireman standing next to you at the time who is an expert in this.[70]

Most notably, the DOT Emergency Response Guidebook specifically provides the following cautionary language regarding its use, to wit:

> This guidebook will assist responders in making initial decisions upon arriving at the scene of a dangerous goods incident.  It should not be considered as a substitute for emergency response training, knowledge or sound judgment.  ERG 2000 does not address all possible circumstances that may be associated with a dangerous goods incident.  *It is primarily designed for use at a dangerous goods incident occurring <u>on a highway</u> or <u>a railroad</u>.*.[71]

The incident in question did not occur on a highway or a railroad, both of which are typically located in more remote or rural locations.  The situs of this particular incident is a strip mall parking lot in the residential area of Algiers (a subdivision of New Orleans, Louisiana).  In addition to concern for the safety of residents, officers of the NOPD were also cognizant of schools, a nursing home and a church in the vicinity.[72]

State Trooper Shone Jackson testified that the evacuation had already commenced upon his arrival at the scene of the incident.  Captain Helmers of the NOFD Hazmat unit was advised that the incident involved MEA via radio; he arrived after NOPD and Engine 40/Captain Reiser.

---

[70]Deposition of Captain Mark Willow at pp. 49-50.

[71]DOT Emergency Response Guidebook at p. 2 (all emphasis added) [Exh. 6].

[72]*See* Deposition of Lt. Gremillion at p. 18.

According to Capt. Helmers, a ½ mile evacuation radius had already been ordered; in his opinion, only the immediate area needed to be isolated because there was no explosion and no fire in progress.  This included 80 to 160 feet in all directions and the residences along the canal. Essentially, Capt. Helmers testified that, had he been a *first* responder, only the strip mall parking lot and 3 or 4 houses on the backside of the canal would have been evacuated.

Capt. Helmers noted that once an evacuation is implemented, it is only appropriate to reduce the area of evacuation *after a full assessment of the risk has been accomplished*.  A full assessment included determining whether the tank had been breached, the source of any leak, how much chemical had leaked and the condition of the tanker.[73]  The time line reported in the NOFD's Incident Recall [Exh 15] is contemporaneously constructed by the dispatcher as notification calls come in and as information is provided by officers in charge of the scene.[74]

A synopsis of NOFD's Incident Recall of August 19, 2004 provides in pertinent part:

**Time   Incident Initiated By**

07:38   Units   FD/Engine 33 and NOPD/98
        Location by the Dry Cleaners 4800 Gen. Meyer Ave.
07:44   FD/CO8
        FD/C210
07:52   Emergency Management Called No Answer; Emergency Mgmt. Paged.
07:54   Emergency Management Notified.
07:56   Homeland Security Paged; C210 Acknowledged on the Air.
07:58   CO8 Coordinating with Police to Evacuate a Radius of 6 miles.
07:59   Capt. Neidliger Notified
08:00   Unit FD/ E40
08:01   Staging in the Parking Lot of Harry's Ace
08:10   State Police HAZMAT and DEQ notified

_____

[73]*See* Trial Testimony of Capt. Helmer's, captain of the NOFD Hazmat unit on August 19, 2004.

[74]*Id.*

08:11   NOPD Command Desk notified
08:11   Chem Name Monoethanolamine        C210 assuming the command
08:17   Level I notifications made
08:23   DEQ Natasha notified.
09:15   Incident type changed from FUEL to CHEM
09:18   Red Cross notified
09:38   Incident in progress 2 hours
09:42   Red Cross Evacuation Center located at Berhman Stadium 2500 Gen. Meyer Ave.
10:16   Command reports State Police and HM went over this incident and determined
            it is not a big spill
11:04   Party involved: Transport Services
11:18   Command reported smaller evacuation area now Gen. Meyer to Danny from
            Huntlee to River Oaks
11:20   Reports Clean Up Co. And Kingsmill on the Scene will upright the vehicle
11:21   Getting action report together and should start up-righting the vehicle
11:34   Getting ready to upright the vehicle and watching area
12:25   Now up-righting tanker
12:31   Tanker has been successfully up-righted
14:50   Tanker has left scene
09:42   *********** correction on evacuation area*****************
09:42   Evacuation area of ½ mile. Six Blocks
10:20   Community Alert Launched for this Incident

*See* NOFD Incident Recall [Exh. 15].

Additionally, the Entrado Informed Response Report (Reverse 911 Alert) [Exh. 16] indicates

that the time of the notification was 9:50 Central Time/7:50 Mountain Time, which was before

the State Police and the dispatched HAZ MAT unit went over this incident and determined that it

was not a big spill.[75]

### III. CONCLUSIONS OF LAW

*Jurisdiction*

This claim for damages under the laws of the State of Louisiana falls within the

diversity jurisdiction of this Court and venue is proper.

---

[75]*See* NOFD Incident Recall [Exh. 15/p. 005].

21

*Course and Scope*

Louisiana law pertaining to an employer's vicarious liability is well settled and was summarized by the supreme court in *Baumeister v. Plunkett*, 673 So.2d 994, 996-97 (La. 5/21/96):

> The law in this area is clear that an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment. *Orgeron v. McDonald*, 639 So.2d 224, 226 (La. 7/5/94). The course of employment test refers to time and place. *Benoit v. Capitol Manufacturing Co.*, 617 So.2d 477, 479 (La.1993). The scope of employment test examines the employment-related risk of injury. *Id.*

According to Louisiana Civil Code article 2320, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."  In order for an employer to be vicariously liable for the tortious acts of its employee the "tortious conduct of the [employee must be] so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interest." *Barto v. Franchise Enterprises, Inc.*, 588 So.2d 1353, 1356 (La. App. 2d Cir.1991), *writ denied,* 591 So.2d 708 (1992) (*quoting LeBrane v. Lewis*, 292 So.2d 216, 217, 218 (La.1974)).

"An employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours." *Scott v. Commercial Union Ins. Co.*, 415 So.2d 327, 329 (La. App. 2d Cir.1982) (*citing Bradley v. Humble Oil & Refining Co.*, 163 So.2d 180 (La. App. 4th Cir.1964)).  "Vicarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective." *Id.*

More specifically, in *LeBrane v. Lewis,* the Louisiana Supreme Court considered the following factors in holding an employer liable for a supervisor's actions in stabbing his fellow employee:

> (1) whether the tortious act was primarily employment rooted;
> (2) whether the violence was reasonably incidental to the performance of the employee's duties;
> (3) whether the act occurred on the employer's premises; and
> (4) whether it occurred during the hours of employment.

292 So.2d at 218. This does not mean that all four of these factors must be met before liability may be found. *Miller v. Keating*, 349 So.2d 265, 268 (La.1977).   As noted above in *Scott*, an employer is not vicariously liable merely because his employee commits an intentional tort on the employer's premises during working hours.  415 So.2d at 329. The particular facts of each case must be analyzed to determine whether the employee's tortious conduct was within the course and scope of his employment. *Scott*, 415 So.2d at 329.

Generally speaking, an employee going to and/or from work is not considered as acting within course and scope of his employment to such an extent as to render his employer liable to third persons for the employee's negligent acts. *Gordon v. Commercial Union Ins. Co.,* 503 So.2d 190, 194, (La. App. 4 Cir.1987), *writ denied*, 506 So.2d 1227 (La.1987).  The rationale of this principle is that an employee usually does not begin work until he reaches his employer's premises. *Orgeron*, 639 So.2d at 227. Therefore, unless the employee has a duty to perform a service or task en route, the employee's commute to and from work is usually considered outside the course and scope of employment. *Id.*

As aforestated, an employer is responsible for the negligent acts of its employee when the conduct is so closely connected in time, place, and causation to the employment duties of the

employee that it constitutes a risk of harm attributable to the employer's business.  *Orgeron on Behalf of Orgeron v. McDonald*, 639 So.2d 224, 227 (La.1994) (*citing LeBrane v. Lewis*, 292 So.2d 216 (La.1974)).  In determining whether the employee's conduct is employment-rooted, the court assesses several factors, including the payment of wages by the employer, the employer's power of control, the employee's duty to perform the particular act, the time, place and purpose of the act in relation to service of the employer, the relationship between the employee's act and the employer's business, the benefits received by the employer from the act, the motivation of the employee for performing the act, and the reasonable expectation of the employer that the employee would perform the act.  *Orgeron*, 639 So.2d at 227; *Reed v. House of Decor, Inc.*, 468 So.2d 1159 (La.1985).

The present case involves the application of the principle that an employee who is traveling from home to work or returning from work to home is generally not within the course and scope of his employment. Because an employee usually does not begin work until he reaches his employer's premises, his going to and coming from work is generally considered outside the course of his employment unless he has a duty to perform en route.  Moreover, an employee's place of residence is a personal decision not directly controlled by the employer, and treating commuting time as part of the determination of course and scope of employment would remove manageable boundaries from the determination.

In *Orgeron*, the Louisiana Supreme Court observed:

> The going and coming rule applies nicely when the employee has a fixed place of work, so that his traveling back and forth between his home and his fixed place of work is almost never in the course of employment.  However, not all employees work on the employer's premises or have a fixed place of work.  The dispatching of employees to different work locations gives rise to many "shades of gray" in the otherwise "black and white" applications of the going and coming rule.

24

When an employee is required to check in at a certain place and is then
dispatched to the work site for that day, he is generally in the course of
employment in the travel between the check in place and the work site, but not
between home and the check in place. *See generally* Arthur Larson, Law of
Workman's Compensation § 16 (1993).  However, when an employee is
instructed to report to work sites which change periodically, without first
reporting to a check in place, there are more even more variations in the
determination of course and scope of employment.[76]

Following *Orgeron*, *supra*, the court in *Bergeron v. Mar-Con, Inc.*, 705 So.2d 232 (La.

App. 3 Cir. 11/26/97), *writ denied*, 719 So.2d 52 (La.5/8/98) held that, as a general rule, an

employee involved in an accident while traveling to and from work is not acting within the

course and scope of his employment and is therefore not entitled to workers' compensation

benefits.  However, the *Bergeron* court also cited *Orgeron*'s exception that an employee who is

required to check in at a certain place and then dispatched to the work site generally is engaged

in the course of employment while traveling between the check-in place and the work site, but

not between home and the check-in place.

Transport's employee, Holmes, was required to check-in at the Port Allen terminal before

departing for Sumter, South Carolina. Applying the holdings in *Orgeron* and *Bergeron*, Holmes

was engaged in the course and scope of his employment with Transport. The facts undeniably

indicate that Transport interested itself in the transportation of its employees because it provided

both the tractor and the specialized tanker designed for hauling hazardous chemicals.  It paid

Holmes both a salary and $0.38 a mile.  Transport paid fuel expenses and certain travel-related

expenses in the event one of the tractor/tanker units broke down during a haul.

It is well settled jurisprudence that where transportation is furnished as an incident of

---

[76]*Orgeron*, 639 So.2d at 227.

employment, either through a vehicle or payment of expenses, and where wages are paid for the

time spent traveling, the employee is engaged in the course and scope of employment.

*Michaleski v. Western Preferred Cas. Co.*, 472 So.2d 18 (La.1985);[77]  *Howard v. City of*

*Alexandria*, 581 So.2d 321 (La. App. 3 Cir. 1991);[78] *Johnson v. Aetna Casualty and Surety*

*Company*, 387 So.2d 1340 (La. App. 1 Cir), *writ denied,* 393 So. 2d 746 (La. 1980);[79]  *Castille v.*

*Sibille*, 342 So.2d 279 (La. App. 3 Cir.1977);[80] *Keith v. Gelco Corp*.,  705 So.2d 244 (La. App. 2

---

[77]In *Michaleski*, the employee, an oilfield worker, was returning to the rig after having
eaten at McDonald's a few miles away.  He fell asleep at the wheel and seriously injured the
plaintiff.  The issue was whether the employee was within the course and scope of his
employment so as to make the employer responsible for the tort.  The employee was furnished a
food and gas allowance by his employer; he could be called back at any time during the day.  In
the case *sub judice,* Transport furnished Holmes fuel for the haul. Most notably, the employer-
provided transportation exception as stated by the Louisiana Supreme Court in *Michaleski* does
not require the employee to receive wage payment for travel time. *See Michaleski*, 472 So.2d at
20.

[78]The *Howard* court found the employee was within the course and scope of his
employment when an accident occurred in a city work truck while the employee was at lunch.
The employee was subject to being called back at any time during his lunch hour; he was also
assigned by a supervisor to one of six city vehicles to drive that day and was required to drive it
because his maintenance duties necessitated that he travel from one location to another in the
city.  In this case, Holmes was assigned one of any number of Transport's rigs to haul chemicals
from the Port Allen terminal to any number of Transport's customers' locations in and out of the
state of Louisiana.  More specifically, Holmes had made road progress on a long distance
delivery from Transport's Port Allen terminal to its customer in Sumter, South Carolina.
Holmes had stopped (albeit at home) to comply with Transport's 15 Hour Service Rule.  Willson
admitted that Holmes would be required to make to rest stops during this particular long distance
delivery assignment.

[79]In *Johnson, supra,* because the pick-up truck involved in the accident was "an
instrument of the worker's trade," the court found that the employee-driver was in course and
scope of his employment.  The plaintiff in *Johnson* was a timber contractor who provided his
own trucks to carry his employees and equipment to and from work.  In the instant case,
Holmes's tractor/tanker rig furnished by Transport is obviously an instrument of the trade
(hauling hazardous chemicals).

[80]In *Castille*, the court observed: "The courts have upheld employees entitled to
workmen's compensation in those cases in which the employer had concerned himself with the

Cir. 12/10/97);[81] *Brooks v. Guerrero,* 831 So.2d 424 (La. 5th Cir. 2002);[82] *Dean v. Southmark Const.,* 879 So.2d 112 (La. 2004).[83]

Transport's uniform practice was to provide its employees with transportation to and from hauling assignments. This was done to ensure the safety of the hazardous materials transported to various customers' sites in and outside of Louisiana. No employee, including Holmes, was ever required to take his own tractor trailer rig for an in-state or a long distance hauling assignment. Transport also paid Holmes $0.38 per mile. Fuel was furnished for the haul. Transport's tractor-tanker rigs were instruments of its trade.

The course and scope test refers to time and place. The scope of employment test

---

transportation of his employees – he has furnished transportation; and/or is furnished travel expenses or is paid wages for time spent traveling." *Castille,* 342 So.2d at 281.

[81]Regarding the "course of employment" inquiry, the time, place and employment activity at the time of the accident must be considered. For employees who are paid for the travel time to and from the work site, the daily employer/employee relationship does not terminate until employees have reached their destination after the end of a work day. Until they reach their destination, the employees are considered actively engaged in the employer's business. *Keith v. Gelco Corp.*, 705 So.2d 244.

[82]The *Brooks* court identifies yet another variation on the exception to the going to and from work rule. The exception identified is the situation where the operation of the vehicle actually is performance of the employment responsibility. The court found that going to lunch arose out of the nature of the employment. In *Brooks,* the employment required that the workers be on the road during the course of the work day. In the case at bar, an 8 hour rest period after 15 hours on duty arose out the nature of Holmes's particular employment – i.e., operating a tractor/tank rig on long distance hauls of hazardous chemicals. Transport's employment requires drivers to be on the road for long hauls and the tractor/tanker rigs must be parked during periods of mandatory downtime. It cannot seriously be argued that it is not foreseeable that a company driver would park his tractor and tanker in unauthorized areas during a long haul. Company rules proscribing such action envision the conduct of Holmes in this instance.

[83]In *Dean*, plaintiff was considered "on the clock" at the time his injury occurred because he was being transferred to a job site by his employer. He was expected to return to perform work-related tasks after the deviation had concluded. The Louisiana Supreme Court affirmed the finding that Dean's injury occurred in the course and scope of his employment.

examines the employment-related risk of injury.  *Baumeister*, 673 So.2d at 996.  Holmes

unauthorized parking of his trailer and tanker so that he could go home and get 8 hours sleep

before continuing his hauling assignment to Sumter was in furtherance of the business of

Transport, even though he was negligent in carrying out his responsibility to adhere to the

company's 15 Hour Service Rule.  In general, Holmes was attempting to further the mission of

Transport.

The scope of the risks attributable to an employer increases with the amount of authority

and freedom of action granted to the employee in performing the assigned tasks.  *Emert v.*

*Hartford Ins. Co.,* 559 So.2d 1141 (La. App. 3rd Cir. 2002).   Like other Transport

driver/employees, Holmes was given considerable authority and responsibility in carrying out his

hauling assignments.

In determining whether vicarious liability attaches, the focus on the employee's general

activity at the time of the incident, rather than on specific tortious conduct, and the fact that the

act is proscribed or performed in a forbidden manner does not remove the act from the scope of

employment.  *Price v. La. Dept. Of Transp. and Development,* 608 So.2d 203, 210 (La. App. 4th

Cir. 1992) (*citing Lebrane v. Lewis*, 292 So.2d 216 (La. 1974).  Holmes violation of two

company rules, while attempting to satisfy a third does not remove him from the course and

scope of his employment.  There is no question that Holmes was on duty at the time of the

incident and was acting in the course and scope of his employment when the tanker overturned

while parked in the strip mall lot between the hours of 2200 on August 18, 2004 and 0730 on

August 19, 2004.

Transport contends that Louisiana jurisprudence holds that the intangible benefits upon

which the Braud plaintiffs rely are insufficient to bring Holmes's activity within the scope of his official duties. Transport submits that the benefits must be substantial and, in this case there was none all.  The defendant relies on Article 2320 cases involving a frolic outside of the course and scope of employment at the time of the accident – *i.e.*, a *purely* personal mission.[84]  Essentially, the defendant's position is that Holmes' conduct was "entirely extraneous to Transport's interests."  This Court is not persuaded.

This case falls outside of the ambit of the heartland of Article 2320 and Workers' Compensation cases that in involve a frolic or recreation-related activities not in furtherance of the business interests of the employer.  For instance, the *Williams* case involved an employee who took his sisters to visit their mother during his lunch hour.  Thus, the employee was on a *purely* personal mission, with no benefit to his employer at the time of the accident; therefore, he was not acting within the scope of his employment.[85]

Holmes was not a frolic; he was on duty – *i.e.*, "a long haul" to Sumter S.C. in one of Transport's Qualcomm-equipped tractor/chemi-tanker rigs.  Having been on duty more than 15 hours waiting for a "road-worthy" carrier, he followed company rules, parked the rig and tractor (albeit not in an area authorized by the company) and got the mandatory rest/sleep to resume the long haul.  Most notably, *at the time of the incident* Holmes was obtaining the rest required by company policy and federal regulations so that he could make further progress along *his* course

---

[84]Transport cites *Williams v. Markel Lumber Co.*, 566 So.2d 446 (La. App. 4th Cir. 1990) for the proposition that the mission of the employer is not served if the employee's conduct occurs when he has abandoned or completed his employment and engages in an activity in no way related to the employer's business.

[85]*Williams v. Markel Lumber Co.*, 566 So.2d 446 (La. App. 4th Cir.), *writ. denied*, 569 So.2d 981 (La. 1990).

to the assigned destination.  Undeniably, "shut-eye" was within the scope of the work; as to

"course", Transport specifically left that entirely up to the driver.  Holmes's "use" of the

tractor/tanker was at all pertinent times authorized and in this case an instrumentality of his

employment.  His objective in parking the tractor and trailer was obviously to get necessary rest,

an issue which so concerned Transport that it has several company rules on point.  During a

long-distance haul, such as the assignment to deliver MEA to Sumter, Holmes was "duty bound"

to use Transport's tractor/tanker rig while on personal missions.  While Holmes could have slept

in the cab, that was not required.  Finding a place to sleep and to eat, *inter alia*, clearly

contemplated use of the company-owned rig.

In determining whether an employee was in the course and scope of his employment at

the time of an incident, every case must be decided on its own facts.  With respect to "scope,"

company rules mandated sleep/rest for the requisite number of hours at specified  intervals, such

that even Holmes's downtime during a long-distance haul remained within the scope of

employment. In addition, "a delivery" is defined in Transport's Driver Operation Manual as "the

driver's entire tour of duty, from the time he reports to the terminal for dispatch until the time he

returns and submits the paperwork," provided that "actual road movement between origin and

destination ... occurs." [Exh. 10/DEF 973].  It cannot seriously be questioned that Transport's

tractor-tanker rig was an instrumentality of employment and such was entrusted to the care and

custody of its company driver, Holmes, during the entire course of the long-distance haul in

question.

Based upon all of the evidence submitted at trial, the Court has determined that Holmes

was furthering the mission of his employer Transport when the incident in question occurred.

Suffice it to say, he was within the course and scope of his employment.

*Third Party Fault*

In *Hardy v. Bowie*, 744 So.2d 606 (1999), the Louisiana Supreme Court discussed the

Legislature's actions in adopting the exemption for public entities in the exercise of their duties.

The *Hardy* court noted that "cases involving allegations of liability on the part of police officers

or other employees of public entities that have come before the Court have not resulted in an

application of the public duty doctrine, but rather have involved the application of a duty-risk

analysis to the facts of the particular case."[86]

In *Syrie v. Schilhab*, 693 So.2d 1173 (La. 1997), the Louisiana Supreme Court set out the

duty-risk analysis used to determine whether liability exists.  Under this analysis, the evidence

must demonstrate that the conduct in question was a cause-in-fact of the resulting harm, the

defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant

and the risk of harm was within the scope of the protection afforded by the duty breached.[87]

Each element of the duty-risk analysis is dispositive in that, if any one element is not present,

liability cannot result; all four inquires must be affirmatively answered.[88]

In addressing the duty owed by a police officer, the Louisiana Supreme Court in *Mathieu*

stated that the scope of an officer's duty to act reasonably under the circumstances does not

---

[86]*Hardy v. Bowie*, 744 So.2d 606, 612 (La. 1999) (citing *Stroik v. Ponseti*, 699 So.2d 1072 (La. 1997);  *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318 (La. 1994);  *Berry v. State Through Dept. Of Health and Human Resources*, 637 So.2d 412 (La. 1993); *Roberts v. Benoit*, 605 So.2d 1032 (La.1991)).

[87]*Syrie v. Schilhab*, 693 So.2d 1173, 1176-77 (La. 1997); *Berry v. State, Through Dept. of Health and Human Resources*, 637 So.2d 412, 414 (La. 1994);  *Mundy v. Dept. of Health and Human Resources*, 620 So.2d 811, 813 (La.1993).

[88]*Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 322  (La. 1994).

extend so far as to require that the officer always choose the "best" or even a "better" method of approach.[89]  Defendant's in the case at bar have failed to make the threshold showing – *i.e.*, a breach of duty by either the first responders of the NOPD or the NOFD.

Under the duty-risk analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached.[90]  Whether a duty is owed is a question of law.[91]  "The inquiry is whether the plaintiff has any law  –  statutory, jurisprudential, or arising from general principles of fault  –  to support his claim."[92]

Governmental agencies in the performance of governmental functions may be subjected to the imposition of certain duties, the breach of which may result in liability for damages to those injured by a risk contemplated by that duty.[94]  The determination of whether a particular duty should be imposed on a particular governmental agency is a policy question.[95]  The court's role is to determine whether there is any jurisprudential or statutory rule or policy reason why, under the facts and circumstances of this case, the city would owe a duty to plaintiffs for their

---

[89] *Id.* at 325.

[90] *Berry*, at 414.

[91] *Id.*

[92] *Id.* (citing *Faucheaux v. Terrebonne Consol. Government*, 615 So.2d 289, 292 (La. 1993).

[94] *Hardy*, 744 So. 2d at 614 (citing *Fowler v. Roberts*, 556 So.2d 1, 7(La. 1989)).

[95] *Id.*

injuries.[96]

Generally, a "police officer has a duty to perform his function with due regard for the safety of all citizens who will be affected by his action."[97]  "His authority must at all times be exercised in a reasonable fashion and he must act as a reasonably prudent man under the circumstances."[98]  As aforestated, officers are held to choosing a course of action which is reasonable under the circumstances.[99]

Considering all the facts and circumstances of this case, it is clear that first responders of the NOPD and NOFD had a duty to act reasonably to investigate the hazardous chemical spill, possible violation of the law and to protect citizens who may be harmed by the violation. When the officers arrived at the scene and discovered the overturned tanker and MEA leaking from the tank, they had the affirmative duty to choose a reasonable course of action in investigating the the incident, establishing an isolation area and maintaining a safe perimeter until the hazard was removed.  Having identified the duty owed by the officers, the Court now turns to the determination of whether that duty was breached.

It is clear from the testimony of all of the *first* responders that they were well-aware that Transport's overturned tanker was loaded with 46,500 pounds of MEA.  First responders  were limited in their ability to assess the hazard at the outset and utilized the DOT Emergency

---

[96] *Id.*

[97] *Smith v. Lafayette Parish Sheriff's Dept.,* 874 So.2d 863, 869 (La. App. 3rd Cir.) (finding under all of the attendant circumstances and properly from the LPSD's perspective that the LSPD's actions regarding its investigation were reasonable), *writ denied,* 885 So.2d 595 (La. 2004).

[98] *Id.*

[99] *Mathieu*, 646 So.2d at 325.

Response *Guide* Book [Exh. 6] and the Hazardous Material Safety Data Sheet [Exh. 5]. Neither of the defense experts, Dr. Stage nor Dr. George, were present making calculations regarding the potential hazardous effects of the MEA spill or the potential for an explosion involving any amount, much less an amount greater than 5 gallons of the product.

Employing the requisite haste such emergency situations involving chemical spills demand, first responders determined that the presence of a leaking tank of MEA which contained 46,500 pounds of hazardous material presented a potentially deadly situation in the *residential* location of 4800 Gen. Meyer Ave. in Algiers, Louisiana. Officers of the NOPD and NOFD considered the known and unknown risks and appropriately factored in the potential risk of cloud burst, fire or explosion. Erring on the side of caution and in short order, first responders expanded the isolation area (evacuation perimeter) to roughly a half-mile radius (six blocks). Under the circumstances presented, this was an appropriate response to a potentially significant risk of public hazard in an urban area and not a gross overreaction.

Clearly, the officers were reasonably discharging their duty when they ordered a ½ mile evacuation of the residential area. Indeed, after a thorough search of the jurisprudence, this Court was only successful in finding reported and unreported decisions involving claims against first responders because of their *under*-reaction to the hazard presented – *i.e.* their failure to establish and maintain an isolation perimeter with respect to a chemical spill or fire hazard.[100] In

---

[100]*See Alexander v. Norfolk Southern Railway Systems*, 2003 WL 1618671 (E. D. La. 2003) (plaintiffs sought to join first responders to an incident involving the alleged leak of toxic chemical vapors from railroad tank cars claiming that they performed their operational duties recklessly or negligently in failing to evacuate the vicinity and failing to divert vehicular and pedestrian traffic and that said conduct on the part of first responders increased their exposure to the allegedly toxic vapors); *Noble v. Norfolk Southern Corp.*, 2003 WL 1618590 (E. D. La. 2003) (same); *Cager v. Norfolk Southern R. Co.*, 2003 WL 1618661 (E. D. La. 2003) (same);

this case, the Court finds the *judgment* exercised by the first responders (officers of the NOPD and/or NOFD) in establishing an isolation perimeter of a ½ mile radius from the overturned HAZMAT tanker loaded with MEA in this densely populated urban area was not negligent. More particularly, there was no breach of their duty to serve and protect area residents.   NOPD and NOFD officers followed the policy of their respective departments – *i.e.*, to place the safety of citizens first in light of the real hazard presented in this case.[101]

The officers followed protocol and consulted The DOT Emergency Response Guidebook as required– *i.e.,as a guide.*  It specifically provides that it was *designed primarily* for use at a dangerous goods incident occurring on a *highway* or *railroad.*  Considering that this incident occurred in a more heavily populated residential area with a school and a nursing home in the vicinity, officers of the NOFD and NOPD appropriately interjected their training, knowledge and

---

*Colin v. Norfolk Southern Corp.*, 2003 WL 1618667 (E. D. La. 2003) (same);  *Molina v. City of New Orleans*, 830 So.2d 994 (La. App. 4th Cir. 2002) (describing the failure of NOPD and/or NOFD to maintain perimeter and divert traffic during an attempt to extinguish fire that had been burning several days in the Almonaster dump adjacent to the road, the abandonment of traffic control efforts by NOPD late in the afternoon due to a shortage of manpower and neither the NOPD or NOFD invoked alternative measures to warn motorists), *writ. denied*, 840 So.2d 573 (La. 2003); *Wilson v. Town of Mamou*, 972 So.2d 461 (La. App. 3 Cir.), *writ denied*, 978 So.2d 307 (La. 2008) (Statutes immunizing law enforcement officers who exercise due care in providing assistance and immunizing public entities and their officers in the exercise of policymaking or discretionary acts did not apply in wrongful death action against police department accused of failing to provide assistance to a woman who was victim of domestic abuse; police officer was statutorily required to protect the woman from further domestic abuse and allegedly failed to do so, and officer's actions were neither discretionary nor policymaking).

[101]*See Kniepp v. City of Shreveport,* 609 So.2d 1163 (La. App. 2nd Cir. 1992) (finding that Chief Gruber's decision to pull back from the crowd was an exercise in discretion in that he assigned priorities to life and property which was grounded in socio-economic policy), *writ denied,* 613 So.2d 976 (1993); *Taylor v. City of Shreveport,* 653 So.2d 232, 241 (La. App. 2nd Cir.) (noting that, along with a duty to maintain order and to enforce the law, police have a duty to protect the citizenry, finding no breach of any legal duty and therefore unnecessary to address respondeat superior liability), *writ denied,* 655 So.2d 333 (La. 1995).

sound judgment into the equation.

Because of the potential risk of explosion or chemical inundation until the condition of the tanker could be determined *and* the load righted without incident, there is no question but that their emergency responses were reasonable at all times.  State Trooper Shone Jackson, a specialist in handling incidents involving hazardous materials, testified that, when he arrived at the site of the incident, the evacuation orders had already been implemented by the NOPD/NOFD.  Trooper Jackson further testified that, once an evacuation is effected, standard operation procedure requires a complete evaluation of all of the attendant circumstances before such orders are rescinded or the isolation perimeter is reduced.  In this regard, Trooper Jackson admitted that he did not have DEQ readings and had not completed his "hands-on" physical inspection of the overturned tanker until after the time that the evacuation orders were implemented and the Intrado alert system was called by the NOPD.

Under Louisiana law, the defendant bears the burden of proving contributory negligence/comparative fault by a preponderance of the evidence.[102]   The defendants have failed to adduce evidence that the Emergency Response Guidebook addressed every Haz-Mat incident, including the incident in question which occurred in an *urban* setting.  The location of this particular hazardous incident militates in favor of finding that first responders, NOPD and/or NOFD, did not grossly or even negligently overreact.  Under the circumstances, any error on the side of caution for the safety of the residents within a half mile radius (six blocks) of the

---

[102]*See Barnes v. Quinlan*, 2002 WL 31375606 (E. D. La. 2002) (Englehardt, J.) (citing *Hano v. Louisiana Department of Transportation and Development*, 529 So.2d 796 (La. App. 1st Cir.1987) and noting that a defendant who relies on contributory negligence as a defense bears the burden of proving plaintiff's negligence and that such negligence was a contributory cause)).

potential hazard was warranted.

There is no question but that the first responders were faced with a potentially deadly situation.  MEA is classified as a dangerous and combustible chemical. [Exh. 5].  The tank was loaded with 46,500 pounds of this hazardous material.  The situation presented was that an unknown quantity of the substance had leaked from the tank and continued to leak from the damaged/overturned tanker in a strip shopping mall in an urban residential area.  First responders were not in a position to establish how much MEA had leaked out in light of the fact that it had rained the night before and because the product decomposes upon exposure to air, light and moisture.  There was no evidence indicating precisely when the tank had overturned or precisely how long it had been leaking and at what rate.

Moreover, it became clear to first responders that the leaking washout valve was compromised and under the pressure of approximately 46, 500 pounds of hazardous chemical, which the washout valves were apparently not designed to withstand.  Had the valves failed prior to righting the tanker, a hazardous chemical would have inundated the area.  Isolating more than the just the immediate area – *i.e.*, a reasonable ½ mile radius from the spill – was a necessary judgment call not contraindicated by the hazards from ignition sources presented in this urban densely populated area.  Although it was later determined that the tank itself was not compromised, the washout valves clearly were; there was no certainty that they would not fail completely under the pressure *before the tanker was righted*.

Where, as here, first responders acted reasonably under the circumstances presented, there can be no assignment of third party fault.

## IV. SUMMARY OF CONCLUSIONS

For all of the above discussed reasons, the Court finds that Transport Services' and Jerome Holmes' affirmative defense based on third party fault is without merit.  Additionally, the Court has determined that Jerome Holmes was operating within the "course and scope" of his employment at all pertinent times.

New Orleans, Louisiana, this 31st day of October, 2008.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**