# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PAMELA BRAUD, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-1898** |
| | c/w 05-1977 &5557 and 06-891 |
| **TRANSPORT SERVICES OF ILLINOIS** | **DIVISION (3)** |
| **and JEROME HOLMES** | **28 U.S.C. § 636 ( c )** |

## MEMORANDUM RULING
### DENYING
### MOTION FOR CLASS CERTIFICATION

Before the Court is the Motion for Class Certification as Supplemented (Doc. Nos. 65 and 93) filed on behalf of plaintiffs, Ibrahim Atmari, Cornell Davis, David Jackson, Vicki Siezler-Duzac and Annie Meredith (hereinafter the "Braud plaintiffs"). The Motion is opposed. (Doc. Nos. 175, 189 and 191).

After a thorough review of the law, the record, the Supplemented Motion for Class Certification, plaintiffs' memoranda in support, defendants' memoranda in opposition, all of the documentary exhibits and deposition and trial testimony submitted by the parties for consideration, Plaintiffs' Motion for Class Certification is DENIED for the following reasons.

## I. BACKGROUND

This putative class action involves an incident – a chemical spill from an overturned tractor-trailer tank truck – which occurred in the 4800 block of General Meyer Ave. in Algiers, Louisiana on August 19, 2004. The overturned tanker contained 46,500 pounds of monethanolomine (MEA), a hazardous chemical. It is undisputed that a small amount of the chemical was released.

The *Braud* Plaintiffs allege that they suffered damages as a result of the spill and seek to represent a class of plaintiffs against those they claim are responsible for causing the damage. They brought suit in the Civil District Court for the Parish of Orleans, State of Louisiana, on August 30, 2004 and removed to this Court on May 19, 2005.[1] This matter has already proceeded to trial on the issues of vicarious liability and alleged 3rd party fault of the first responders.[2] The *Braud* plaintiffs propose that a class defined as all persons and/or entities, who/which, on August 19, 2004 were residents of, present in or maintained a place of business in the area affected by the incident – *i.e.*, the area of Algiers, Louisiana bounded by Patterson Drive, Herschel Street, Danbury Drive and Holiday Drive which was evacuated that day. Plaintiffs submit that based upon the unknown (though admittedly small)[3] amount of MEA that was released,[4] they believe that this case is primarily one for damages associated with the ½ mile evacuation that was called by the first responders. More particularly, putative class representatives seek damages for fear and fright, inconvenience and compensatory damages for the economic loss sustained by both businesses and individuals in the area.[5] Plaintiffs also seek

---

[1]*See* Notice of Removal filed May 19, 2005 [Rec. Doc. 1].

[2]*See* Memorandum Opinion dated October 31, 2008 [Rec. Doc. # 159].

[3]*See* NOFD Incident Report at p. 10 at Capt. Jeffrey Reiser's narrative (noting size of the chemical release to be "about 16 ounces") [Trial Exh. 2].

[4]The tanker itself was not breached, the source of the leak was a "wash-out" or "clean-out" cap. September 30, 2008 Trial Testimony of Trooper Shone Jackson at p. 39. DEQ test results revealed that there were no readings – *i.e.*, zero parts per billion (ppm) – within 100 feet of the trailer. Only one (1) ppm was detected right at the cap, which was the source of the leak. It was a very minor leak. *Id.*, at p.43; October 1, 2008 Trial Testimony of Chief John Helmers at p. 96.

[5]Plaintiff's explain that the subclass is proposed for those who were in sufficiently close proximity to the tanker to sustain a relatable physical injury.

to certify a subclass of individuals who sustained physical injury for which they sought medical treatment.

## II. ARGUMENT OF THE PARTIES

### A. Plaintiffs' Position

In support of class certification, Plaintiffs assert that they meet the requirements of Rule 23(a) and 23(b).[6]  Regarding the requirements of Rule 23(b), Plaintiffs state that the proposed class fits into Rule 23(b)(3), which requires the Court to determine (1) whether common issues predominate, and (2) whether a class action is a superior method to resolve the controversy.

Plaintiffs claim that common issues of fact and law predominate over individual issues such as specific causation and quantum of damages.  First, each Plaintiff's loss flows from a single source (Transport's tanker) and from a single event (evacuation following a chemical release from the overturned tanker).  Second, Plaintiffs plead the same legal theories under the same state law.  Third, with the exception of "sub" class of personal injury claimants and class of business enterprises claiming loss of revenues, Plaintiffs submit that they primarily claim the same types and categories of damages including fright, emotional distress, mental anguish and inconvenience. Finally, as to individual determinations of damages, Plaintiffs contend that because a large portion of the damage claims involve mental/ emotional distress, fright and inconvenience related to having to evacuate or remain sheltered in place, their claims will not require individualized scrutiny.

---

[6]For purposes of the instant motion, the Court has assumed that the requirements of Rule 23(a) are met, even though adequacy and numerosity are seriously disputed and present a major hurdle.  Still, because Plaintiffs fail to meet the Rule 23(b) requirements of predominance and superiority, the class cannot be certified.

As to superiority, Plaintiffs submit that a class action is superior to other available methods of adjudicating the proposed class members' claims as there is no known or foreseeable "interest" on behalf of a significant number of class members to individually prosecute their own claims. Plaintiffs characterize this case as a "negative value suit" in that it is not economically feasible to obtain relief in separate suits.[7]  Second, the plaintiffs contend that conducting one trial to determine common issues is superior to hundreds of trials that could end with disparate results for similarly situated individuals.  In sum, plaintiffs argue that the primary purpose of judicial economy will be achieved and the possibility of multiple lawsuits will be reduced. Finally, any management difficulties encountered in the handling of this litigation as a class action will be minimal according to Plaintiffs.[8]

Plaintiffs contend that the Fifth Circuit's decision in *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d 598 (5th Cir. 2006) is inapposite.  In *Steering Committee, supra,* the court affirmed the district judge's ruling denying class certification, holding  that "where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominated over any common issues shared by the class." *Steering Committee*, 461 F.3d at 602.  In that case, the district court denied plaintiffs' motion for class certification because it found that the level of exposure, nature of symptoms, medical treatment received and damages related to injury would dominate any common claims.  Plaintiffs in the

---

[7]*See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996); *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 339 (1980).

[8]*See* Plaintiffs' Memorandum in Support of Motion for Class Certification [Rec. Doc. # 65-2]; Plaintiffs' Supplemental Memorandum [Rec. Doc. # 93-2]; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Rec. Doc. # 190].

case at bar distinguish the pending case, highlighting that (1) the principal claims are for
inconvenience damages for an evacuation period of less than a day and (2) there are a small
number of exceptions for some personal injury claims.[9]

Plaintiffs liken their case to the situation presented in *Turner v. Murphy Oil U.S.A., Inc.,*
234 F.R.D. 597 (E. D. La. 2006). The *Turner* plaintiffs filed a class action seeking damages
resulting from an oil leak which occurred in the aftermath of hurricane Katrina. In granting class
certification, the *Turner* court found that, because the vast majority of the plaintiffs were out of
the area when the spill occurred, damages for personal injury would form only a slight portion of
the plaintiffs' damage claims. The *Braud* plaintiffs argue that the vast majority of their damage
claims are "personal injury" claims in name only, as the term inconvenience has often been used
to refer to such claims. They further contend that the putative class of physical injury claims and
those who obtained medical treatment are *de minimis.* For these reasons, the *Braud* plaintiffs
urge the Court to find their case closer to the *Turner* end of the "spectrum" of claims – *i.e.,*
"clearly more akin to *Turner* than *Ancar*" – and to grant certification.[10]

With respect to the final factor (management of the class), plaintiffs submitted a proposed
trial plan based upon that employed in *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) --
mass tort litigation arising out of an explosion at an oil refinery.[11] They further submit that

---

[9]Plaintiffs' Proposed Findings of Fact and Conclusions of Law at pp. 18-19
(distinguishing both *Steering Committee, supra*, and *Ancar v. Murphy Oil, U.S.A., Inc.,* 2008 WL
2951794 (E. D. LA.) and explaining that the issues of concern in those cases were driven by the
substantially greater magnitude and scope of both incidents which would involve a far greater
range of potential damages than presented in the case at bar) [Rec. Doc. # 190].

[10]*Id.,* at pp. 20-23.

[11]Plaintiffs' Proposed Findings of Fact at p. 23 and Exh. 1.

damages be addressed and fixed by means of a simple grid (*i.e.*, evacuated or sheltered in place) and by allowing for the recovery of demonstrable actual pecuniary loss (lost wages/business income and medical bills for treatment of symptoms related to known effects of exposure to MEA).[12]

### B. Defendants' Position

Defendants oppose the motion for class certification in a number of particulars and urge the Court to find that certain requirements not met. More particularly, defendants contend that certification should be denied because the *Braud* plaintiffs cannot carry their burden with respect to Rule 23(a)(1) numerosity of the class, Rule 23(a)(4) adequacy of representation and Rule 23(b)(3) predominance of common issues and superiority of the class mechanism.

As to numerosity and with respect to the personal injury class, defendants direct the court's attention to the testimony of plaintiffs' expert (Dr. Norman Ott), who can only relate the symptoms of *three* (3) individuals (Vicki Duzac, John Duzac and Gary Gremillion) to the minor chemical release at issue.[13] All three of the aforesaid individuals were first responders (police officers) who were allegedly positioned close to the tanker;[14] all three officers filed their own lawsuits in Civil District Court for the Parish of Orleans.[15] In addition, defendants highlight the expert testimony of Dr. Stephen Stage (Atmospheric Physicist and Dispersion Modeler) and Dr.

---

[12]*Id.*, at p. 23 n. 2.

[13]*See* Deposition of Dr. Norman D. Ott, III, taken Monday, April 2, 2007 at pp. 7-16, 21-27; Medical Records Reviewed by Dr. Ott [Exh. 20].

[14]*See* Deposition of Dr. Norman D. Ott, III, at pp. 7-11.

[15]*See* Petition for Damages filed by Shinette Kelly, Gary Gremillion, Vicki Duzac, John Duzac, and Robert Italiano against Transport Service Co., et al, CDC Case No. 05-10147 [Exh. 26(d)].

William George (Toxicologist, Phamacologist and Expert re Exposure Assessment) that, given the limited release of monoethanolamine ("MEA") and the product's slow evaporation rate, that individuals standing within five feet of the truck would not have sustained any physical injuries with a one time exposure and individuals could have worked under OSHA requirements (40 hours a week for the rest of their lives) within 42 feet of the truck and not sustain any physical harm.[16] Defendants reiterate that DEQ monitoring during the incident resulted in no positive readings, except within an inch of the leaking wash out cap.[17] Individuals including Carol Petranek (DEQ),[18] Transport's truck driver Jerome Holmes,[19] Trooper Shone Jackson (State

---

[16]*See* Trial Testimony of Stephen Stage at pp. 202-214; IEM Report of Stephen Stage at p. 17 (concluding that the area that might have been exposed to chemical levels sufficient to cause medical effects was limited to the area of no more than a few feet from the spill) [Exh. 23]; Trial Testimony of William George at p. 221 (summing up that overall based upon the facts of low volume, no run-off, low volatility, no odor detection [meaning you could smell it before it a level below which you should see no adverse effects] his opinion was that the level of exposure was so minimal that there would likely be no adverse effects).

[17]Trial Testimony of Chief John Helmers, Captain on the responding NOFD Hazmat Materials Unit at pp. 86, 88, 91-93, 96 (noting that there was no odor and that he observed a "very small drip ['maybe one drop every 30 seconds to a minute'] coming a two and half inch, three inch discharge cap," the tester did not show a reading unless within an inch away from the leak and, after the fire department's initial assessment no one wore protective respirator equipment).

[18]Deposition of Carol Petranek of the DEQ taken on February 7, 2007 at pp. 20-25, 41, 71(performed air monitoring within feet of the leak throughout the entire incident, did not wear any type of respirator because she did not consider that necessary, did not recall seeing anyone else at the scene wearing respirators, never smelled any product at the scene, did not experience any adverse effects, and did not observe anyone at the scene who appeared to be sick or suffering any adverse effects).

[19]Deposition of Transport's driver Jerome Holmes taken on September 21, 2006 at pp. 260-262 (who actually touched the chemical wiped his hand off on his pants and suffered no adverse effects).

Police Hazmat Div.),[20] Chief John Hellmers (NOFD Hazmat Div)[21] and Transport's Blake Soileau[22] stood within feet of the product for extended periods of time and sustained no physical injuries.

As to the evacuation class, the defendants contend that the *Braud* plaintiffs' reliance on census data and the Intrado records to establish numerosity is misplaced. In this regard, defendants highlight that: (1) state demographer Karen Paterson admitted that she had no specific knowledge of the incident;[23] and (2) the Intrado documents do not establish that anyone evacuated their homes on August 19, 2004.[24] Defendants note that the plaintiffs never obtained a copy of the recorded message that was played by Intrado and it is not known whether people were told to evacuate or remain inside. Moreover, Captain Louis Dabdoub testified that his officers who went house-to-house advised residents that they had the option of remaining inside of their homes with the air conditioning system turned off.[25]

Defendants note that, until December of 2008, over four years after the incident, the

---

[20]Trial Testimony of Trooper Shone Jackson at pp. 32-35 (who along with Carol Petranek investigated the condition of the overturned tanker).

[21]Trial Testimony of John Helmers at p. 89 (noting that his NOFD command post was on the scene in the parking lot next to the truck).

[22]Deposition of Transport's Blake Soileau taken on July 30, 2007 at pp. 81-85 ( who was on the scene approximately three hours, made the decision to right the tanker, got approval and ordered the wrecker services and ensured that they were Hazmat trained).

[23]*See* Deposition of Karen Paterson taken March 26, 2007 at pp. 33-34 (admitting that she had no way of identifying which people may have evacuated from the areas/zones identified on the map and that she simply used the census data taken from the 2000 census to report the population within the areas/zones depicted on the map).

[24]*See* Intrado Call Log [Exh. 16A].

[25]*See* Deposition of NOPD Captain Louis Dabdoub taken June 21, 2007 at pp. 80-81.

*Braud* plaintiffs had not identified one individual who actually evacuated his or her home as a result of an Intrado alert and to date they have been unable to locate anyone who evacuated his or her home as a result of an emergency responder knocking on their door.  Addressing the December 15, 2008 substitution of Samuel and Annie Meredith as putative class representatives for those individuals who evacuated their homes pursuant to an Intrado alert, defendants point out that Ms. Meredith could not recall whether the Intrado alert message indicated whether the evacuation was mandatory or not.[26]   In summary, defendants reiterate that, other than the Merediths, plaintiffs have identified no individual who received an Intrado alert and actually evacuated their home.

As to the Business class, defendants emphasize that, other than the Spur gas station located "catty-corner" from the shopping center and the tanker truck, the *Braud* plaintiffs have not identified any other business that claims to have sustained damages as a result of this incident. Defendants explain that Exhibit 26(a-c) is comprised of three separate lawsuits that were filed by three businesses in the strip shopping mall where the tanker was overturned; however, two of those three lawsuits have already been settled.

Turning to Rule 23(a)(4) adequacy of representation, defendant contend that the *Braud* plaintiffs have failed to prove that they possess either the willingness or the ability to take an active role and protect the interests of the absentees.   Insofar as David Jackson, Vicki Duzac and Cornell Davis (Putative Personal Injury Class Representatives), the defendants submit that not one of the aforesaid three is adequate, to wit: (1)  Cornell Davis was not an evacuee and he

---

[26]Deposition of Annie Meredith taken Wednesday December 10, 2008 at pp. 17-18.

knows nothing about this lawsuit;[27] (2) David Jackson is not an evacuee nor can his symptoms be related to this incident;[28] and (3) Vicki Duzac, a first responder, filed her own individual lawsuit which is presently pending in Civil District Court.[29]  It is undisputed that a perimeter was set up around the overturned tanker and, other than emergency responders, no one was permitted to approach the truck.  Moreover, Duzac's circumstances are unique in that she alleges that she came within close proximity of the truck.  With her separate lawsuit ongoing, Duzac is not in a position to adequately represent a class of claimants, who unlike herself were never were within close proximity of the overturned tanker.  Indeed, she has interests that conflict with her representation of the class and her separate lawsuit rivals plaintiff's suggestion that a class action is necessary.

As to the evacuation putative class representatives, The Merediths, they demonstrated a complete lack of knowledge regarding this lawsuit; they have done no investigation regarding the facts.  Indeed, Ms. Meredith met with her attorney only once and that was immediately prior

[27]Cornell Davis, a resident of Harvey, Louisiana, was leaving his girlfriend's apartment at 7:30 A.M. on the date of the incident and his truck broke down on Kabel Dr.  While waiting around for his truck, his girlfriend called reporting she learned of the overturned tanker from the television.  Davis then proceeded to Behrman gym and met his girlfriend.  Deposition of Cornel Davis taken October 10, 2006 at pp. 7-8, 16-20, 22, 32-35, 37-39.

[28]David Jackson does not live near the incident but drove his car to the Autozone at about 7:00 a.m. on the morning of the accident.  He never saw the overturned tanker, police officers, police cars, fire trucks, or firemen in the area of the Autozone.  Jackson claims that he noticed a burning sensation in his eyes and on the lower part of his arms on his way home. Deposition of David Jackson at pp. 6, 16-18, 22, 24. Moreover, plaintiff's expert Dr. Ott has testified that Jackson's symptoms are not related to this incident.  Deposition of Dr. Normal Ott, at pp. 21-22.

[29]*See* CDC Case No. 05-10147 Complaint filed by Vicki Duzac and four other individuals [Exh. 26(d)].

to her deposition on December 10, 2008.[30]  Mr. Meredith is equally clueless regarding the subject matter of these proceedings.[31]

Turning to the Business Plaintiffs, defendants emphasize that Ibrahim Atamari, an Israeli national, is not even currently in the country.[32]  Moreover, the defendants object on the basis that Atamari is not a proper party because the Spur gas station is actually a separate legal entity.[33]  In addition, like all of the other putative class representatives, Atamari demonstrated his ignorance of these proceedings, the incident at issue and the class he purports to represent.[34]

In sum, defendants contend that none of the putative class representatives have the requisite sufficient interest to ensure vigorous prosecution of this class action lawsuit, not one of them is either capable or committed to advocate the goals of the class and that the evidence reveals that they are completely disengaged from this case.

In addition, defendants contend that the *Braud* plaintiffs have failed to meet the Rule 23(b)(3) predominance and superiority requirements.  In this regard, the defendants argue that the evidence amply demonstrates that not only will individual issues predominate over the common issues, but also that a class action will not be the superior proceeding.  Consequently, this case will denigrate into mini-trials as to each individual on both the issues of causation and damages.

---

[30]*See* Deposition of Annie Meredith at pp. 39-44.

[31]*See* Deposition of Samuel Meredith at pp. 25, 27-29.

[32]*See* Deposition of Ibrahim Attamari at p. 9.

[33]*See id.,* at pp. 10-11.

[34]*See id.,* at pp. 26-32.

## III. CLASS CERTIFICATION STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class actions. The rule requires that the court determine, "as soon as practicable" after an action brought on behalf of a class is commenced, whether the suit meets the class certification requirements such that the case should proceed as a class.[35] A class action is not maintainable as such simply because the lawsuit designates the cause as a class action. It is not disputed that the class action proposed in this case must satisfy the requirements for certification outlined in Rule 23 (a) and (b).

In ruling upon a motion for class certification, courts treat the substantive allegations contained in the plaintiffs' complaint as true. The issue is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.[36] The court may look past the pleadings to the record and any other completed discovery to make a determination as to the class certification issue.[37]

At the outset, Rule 23(a) sets forth four threshold requirements which must be met in every type of class action case.[38] Rule 23(a) requires that a class: (1) be so numerous that joinder of all members is impractical [numerosity]; (2) have common questions of fact or law

---

[35]*See* Fed. R. Civ. P. 23(c)(1); *Castano v. American Tobacco Company*, 84 F.3d 734, 741 (5th Cir. 1996).

[36]*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2153 (1974); see also *Burrell v. Crown Central Petroleum, Inc.,* 197 F.R.D. 284, 286 (E. D. Tex. 2000); and *In re Lease Oil Antitrust Litigation*, 186 F.R.D. 403, 418 (S. D. Tex. 1999).

[37]*See General Telephone Company v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2371-72 (1982)(noting the district court's duty to conduct a "rigorous analysis" before granting class certification and holding that a decision on class certification remains a fact specific determination); *Spence v. Glock,* 227 F.3d 308, 310 (5th Cir. 2000); and *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

[38]*See James v. City of Dallas,* 254 F.3d 551, 569 (5th Cir. 2001).

[commonality]; (3) have representative parties with typical claims or defenses [typicality]; and (4) have representative parties that will fairly and adequately protect the interests of the proposed class [adequacy].[39] The first two requirements focus on the characteristics of the class; the second two focus instead on the desired characteristics of the class representatives. The rule is designed "to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests."[40]

If the Rule 23(a) criteria are satisfied, the plaintiffs must show that class treatment is appropriate under one of three alternative class categories prescribed by Rule 23(b).[41] Plaintiffs claim only monetary damages, and explicitly seek certification solely pursuant to Rule 23(b)(3), which sets out two requirements – predominance and superiority. *See* Fed. R. Civ. P. 23(b)(3). Subsection (b) provides that:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> ...
> (3) the court finds that the *questions of law or fact common to the members of the class predominate* over any questions affecting only individual members, *and* that a *class action is superior* to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; ( C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the

---

[39]*See* Fed. R. Civ. P. 23(a); *Spence v. Glock,* 227 F.3d at 310 n. 4; *James v. City of Dallas,* 254 F.3d at 569.

[40]*In re Lease Oil Antitrust Litigation,* 186 F.R.D. at 419 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Litigation,* 55 F.3d 768, 799 (3rd Cir. 1995)).

[41]*See* Fed. R. Civ. P. 23(b); *James v. City of Dallas*, 254 F.3d at 568.

management of a class action.[42]

To pass muster under Rule 23(b)(3), plaintiffs must sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case. Together, subsection (a) and (b) requirements insure that a proposed class has "sufficient unity so that absent class members can fairly be bound by decisions of the class representatives."[43]

In *Allison v. Citgo Petroleum*,[44] the Fifth Circuit explained the different categories of class actions detailed in Rule 23(b), as follows:

> Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all. The different types of class actions are categorized according to the nature or effect of the relief being sought. The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all claims. The (b)(2) class action, on the other hand, was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary. Finally, the (b)(3) class action was intended to dispose of all other cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages. Limiting the different categories of class actions to specific kinds of relief clearly reflects a concern for how the interests of the class member will vary, depending on the nature of the class injury

---

[42]Fed. R. Civ. P. 23(b)(3) (emphasis supplied).

[43]*Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2246 (1997).

[44]*Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir. 1998).

alleged and the nature of the relief sought.[45]

A class seeking substantial money damages will more likely consist of members with divergent interests.[46]  Recognizing that monetary damages are more often related directly to the disparate merits of individual claims, the drafters of the rule saw fit to provide prospective (b)(3) class members the absolute right to notice, to opt out and not be bound by membership in a class.[47]  Rule 23(b)(3) applies to cases for which a class action would achieve economies of time, effort, expense, and promote uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.[48]  Whether common issues predominate and the proposed class action is superior requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case.[49]

In the case at bar the plaintiffs bear the burden of proving that: (1) the proposed class satisfies all of the elements of Rule 23(a); and (2) the proposed class also satisfies both requirements of Rule 23(b)(3).[50]  Within the confines of Rule 23, a district court maintains

---

[45]*Id.* at 411-12.

[46]*Id.* at 412.

[47]*Id.*

[48]*See Amchem*, 521 U.S. at 615, 117 S.Ct. at 2246.

[49]*See Berger v. Compaq Computer Corporation,* 257 F.3d 475, 483 (5th Cir. 2001)("'[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Castano*, 84 F.3d at 744.).

[50]*See Spence v. Glock*, 227 F.3d at 310; *Berger,* 257 F.3d at 479-80; *Mullen,*186 F.3d at 623; and *Castano*, 84 F.3d at 743-44 (holding that a court cannot rely on assurances of counsel that any problem with predominance or superiority can be overcome).

substantial discretion in determining whether to certify a class.[51]  In the absence of proof of all required elements, the court may not certify a class.[52]  The Court addresses the plaintiffs' proof as to requisite elements of a Rule 23(b)(3) class action serially herein.

## IV. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Rule 23(a)(1): Numerosity

As to numerosity, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.[53]  Numerically speaking, a class of over one hundred members is sufficient for purposes of numerosity and actual numbers are not determinative of the inquiry.[54]  In addition to numbers, factors relevant to the numerosity inquiry include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim.[55]

Plaintiffs presented very little evidence to the Court in satisfaction of the numerosity inquiry.  In terms of sheer numbers of physically, mentally and emotionally injured or

---

[51]*See Smith v. Texaco,* 263 F.3d 394, 403 (5th Cir. 2001)(recognizing that the certification inquiry is essentially fact based and thus the Fifth Circuit defers to the district court's inherent power to manage and control pending litigation, reviewing certification decisions only for abuse of discretion).

[52]*See Berger,* 257 F.3d at 479-80.

[53]*See James*, 254 F.3d at 570.

[54]*See Street v. Diamond Offshore Drilling*, 2001 WL 568111, at 4 (E. D. La. May 25, 2001)(Duval, J.)("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class consisting of more than forty members 'should raise a presumption that joinder is impracticable.'")

[55]*See Mullen*, 186 F.3d at 624.

inconvenienced potential class members, direct evidence of such was absent. Moreover, consideration of the concise geographical area to which the exposure was confined, together with the fact that the individuals and few businesses affected were members of a very close-knit community, militates against a finding of numerosity.

The fact remains that class members may not have much incentive to bring individual actions because of the amount of perceived damages. Assuming that personal injury or inconvenience was experienced on account of the *de minimis* chemical release or the evacuation advice (Intrado alert or door-to-door alert), it appears from the evidence adduced that only in the rare case (*i.e.*, the case of one or two of the named putative class plaintiffs) is injury attributable to said chemical release or inconvenience attributable to an evacuation call by first responders (via Intrado or door-to-door alert). The evidence discernible from the record is insufficient to allow the Court to presume, for the purposes of the pending motion, that the class would contain a sufficiently large number of members *whose joinder would be impracticable*.[56]

In sum, the named representative plaintiffs' own pleadings admit that the Algiers, Louisiana community affected in any manner or means by the August 19, 2004 incident is indeed a succinct, easily identifiable group of people, all residing in close proximity. Putative class plaintiffs produced no evidence to the effect that area hospitals, health care providers, and/or physicians had more than the usual numbers of patients in general, or that more than two or three area businesses were adversely affected or even mildly interrupted by a four to six hour quarantine of the ½ mile geographic area until the tanker was successfully righted without further incident.

---

[56]*See* Notes 12-25, *supra*, and accompanying text.

### 2. Rule 23(a)(2): Commonality

The test of commonality is not demanding.[57]   The interests and claims of the various plaintiffs need not be identical.  Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.[58] The fact that some of the plaintiffs may have different claims, or claims that may require individualized analysis, will not defeat commonality.[59]

In this case, the potential members of the plaintiffs' class share a common factual circumstance of allegedly suffering some degree of physical/emotional injuries or inconvenience from either exposure to the chemical release or having to evacuate their home for period of hours.  Potential class members also share a common legal theory – *i.e.*, that the conduct of the defendants is actionable under Louisiana law of negligence, pursuant to Article 2315 of the Louisiana Civil Code.  One or the other is sufficient to meet the requirement of commonality. Defendants do not dispute that the plaintiffs met their burden of proof with respect to Rule 23(a)(2)'s commonality requirement.  Thus the Court need only consider the issue of commonality in the context of Rule 23(b)(3)'s more rigorous "predominance" test.[60]

### 3. Rule 23(a)(3): Typicality

---

[57]*See Mullen,* 186 F.3d at 625.

[58]*James*,  254 F.3d at 570 (citing *Forbush v. J.C. Penney Co.,*994 F.2d 1101, 1106 (5th Cir. 1993) quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)).

[59]*Id.*

[60]7A Wright, Miller & Kane, *Federal Practice and Procedure,* § 1763, at 227 (2d ed 1986)(noting the partial redundancy of (a)(2)'s commonality requirement, since the existence of a common question can be viewed as an essential element of (b)(3)'s requirement that common questions predominate over individual issues).

Rule 23(a)'s typicality requirement does not require a complete identity of claims.  It focuses on the similarities between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.[61]

> [T]he critical inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.[62]

Like commonality, the test of typicality is not demanding.[63]  However, to satisfy Rule 23(a)'s typicality requirement, a class representative must be a part of the class and possess the same interest and suffer the same injury as class members.[64]  In the case at bar, the named plaintiffs allege  the same legal theories of recovery arising out the same incident, the August 19, 2004 slight chemical release in a strip mall parking lot in 4800 block of Gen. Meyer Ave. in Algiers, Louisiana.  The putative class representatives all seek the same remedy, *i.e.*, compensatory damages for physical injuries, mental/emotional injuries, fright, inconvenience and loss of income.

With the exception of the business class representative, defendants do not dispute that the typicality requirement is satisfied in this case.  In the case of the Ibrahim Attamari, defendants submit that he is not a proper party in light of the fact that the Spur gas station is a separate legal

---

[61]*James,* 254 F.3d at 571.

[62]*Id.* (citations omitted).

[63]*Id.*; *see also Mullen,* 186 F.3d at 625 (typicality satisfied when plaintiff employees alleged theories of liability for defective air ventilation aboard casino boat under Jones Act and doctrine of unseaworthiness, despite the defendant's argument that each class member's alleged resulting "respiratory illness" may differ).

[64]*See General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2370 (1982).

entity.  The Court is inclined to agree that Ibrahim Attamari is not a part of the class that he purports to represent.  However, aside from that anomaly, the claims asserted by named putative class representatives are based on the same theories of liability as potential class members.

### 4. Rule 23(a)(4): Adequacy

The fourth and final requirement of Rule 23(a) is that the district court must find that the representative parties will fairly and adequately protect the interests of the class.[65]  Rule 23(a)(4)'s adequacy requirement encompasses consideration of the class representatives, their counsel, and  the relationship between the two.  Adequacy of the representation of the class cannot be presumed.[66]  The adequacy requirement contemplates the absence of antagonistic or conflicting interests, and a sharing of interests between class representatives and absentees.  As it should, this Court has assumed for the purposes of this motion for class certification that the injuries alleged by putative class plaintiffs could have and did indeed occur.

The Fifth Circuit in *Berger* emphasized that the party seeking certification bears the burden of establishing that *all* requirements of Rule 23(a) have been satisfied, and that it is error to presume the adequacy of the putative representatives in the absence of specific proof otherwise.[67]  The *Berger* court observed:

> To the contrary, we have described "[t]he adequacy requirement [as one that] mandates an inquiry into ... the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees."  Likewise, ... "it must appear that the representative[s] will vigorously prosecute the interests of the class through qualified counsel."  Both understandings –  even accepting the variance between them –  require the class

---

[65]Fed. R. Civ. P. 23(a)(4).

[66]*See Berger*, 257 F.3d at 479-80.

[67]*Id.* at 479.

representatives to possess a sufficient level of knowledge and understanding to be capable of "controlling" or "prosecuting" the litigation.[68]

Class action lawsuits are intended to serve as a vehicle for capable and committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through those class members.[69]

There is a complete absence of proof regarding the named class representatives' activities with respect to the _instant_ litigation. Named class representatives were unable to testify first-hand regarding any injuries, fright, mental/emotional anguish, inconvenience, damages, illnesses of loss of income suffered *by others* in the allegedly affected Algiers community outside of the individuals who may reside in their own household.[70]

Without question, the requisite zeal on the part of named putative class representatives is lacking. All of the named representatives were only in a position to speak for themselves. Not one of them testified that they inquired into the situation of any of her neighbors, co-workers or anyone else the community, either regarding information about the chemical release, the evacuation or the incident's effect on individuals in the community. It is clear that Ibrahim Attamari has not taken an active role in the litigation, he testified that he is an Israeli national and was not currently located in the country. For their part, the Merediths had done no investigation regarding the facts of the lawsuit and, up until their deposition, had no contact whatsoever with class counsel. Moreover and as previously noted: (1) Neither Davis nor Jackson are evacuees and they both knew nothing about the lawsuit; and (2) Vicki Duzac has

---

[68]*Id.,* at 482-83 (citations omitted).

[69]*Id.*, at 484.

[70]*See* Notes 26-33 and accompanying text.

filed her own individual lawsuit, her circumstances are unique in that she was a first responder and came within close proximity to the *de minimis* spill and, with her own individual lawsuit ongoing, she is not in a position to adequately represent a class of claimants who were never within close proximity of the overturned tanker.[71]

Not one named class representative has managed to foster the impression that he or she is actively engaged in prosecuting this case, either on their own behalf or on behalf of others. Aside from the fact that each sat for a deposition, it is not apparent that any one or more of the named representatives has assumed an active role in the litigation *vis a vis* the prosecution of a "class" of claims or liaison with class counsel. Indeed, Duzac's deposition was noticed in her own individual case, which is pending in Civil District Court (CDC Case No. 2005-10147 Div. A-5, *Shinette Kelly, et al v. Transport Service Co. of Illinois, et al*).

No evidence was adduced demonstrating that the named plaintiffs were even close to fluent with the progress of the litigation and/or have made themselves available as a liaison between their counsel and the absent members. This Court cannot presume adequacy of class representation. Because plaintiffs failed to adduce sufficient evidence to satisfy the requirement of adequacy as to their own representation, the Court need not and does not address the competency of counsel prong of the adequacy analysis.

Albeit unnecessary, the Court addresses the requirements set forth in Rule 23(b)(3) below.

## B. Rule 23(b)(3): Predominance and Superiority

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

---

[71]*See* Notes 26-28 and accompanying text.

cohesive to warrant adjudication by representation."[72]  One should focus on the number and

significance of common questions, as opposed to individual issues when analyzing this

requirement.[73]  This inquiry is "far more demanding" than Rule 23(a)'s commonality

requirement.[74]

In *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir. 1996), the Fifth Circuit

made it clear that deciding whether common issues predominate and whether the class action is

the superior method to resolve the controversy requires an understanding of the relevant claims,

defenses, facts, and substantive law presented in the case.[75]  The plaintiffs' class proposal fails to

satisfy Rule 23(b)(3)'s requirement that the common questions of law or fact *predominate*.  The

Rule's express language indicates that for a class to be certified under 23(b)(3), there must not

simply be some commonality of issues among claims.  Rather the issues that are common must

*predominate* over individual issues.

As to plaintiffs' claims for compensatory damages under Louisiana law, the focus is

almost entirely on facts and issues specific to the individual putative class members, rather than

to the class as a whole.  Causation and damages will turn on the following varying individual

factors: (1) extent of the exposure of each class member; (2) sensitivities which may be found to

exist in individual members of the class which might have precipitated the same symptoms; (3)

the mental or emotional stability of each class member;  (4) varying medical treatment, *if any*,

---

[72]*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

[73]*See Jenkins v. Raymark Indus., Inc*., 782 F.2d 468, 470 (5th Cir.1986).

[74]*Amchem*, 521 U.S. at 623-24.

[75]*Castano*, 84 F.3d at 744.

each plaintiff received; (5) the expense of such treatment, and so on.  Factors such as age, weight, sex, preexisting conditions, and medical history are expected to play a dominant role in resolution of this litigation.  Additionally, the predominant ailments (*i.e.*, headaches, nausea, dizziness, and sore throat) are quite common maladies which may be caused by any number of factors other than the individuals' varying degree of exposure to the elements of MEA, if any, during the short four to six hour period following the de minimis chemical release on August 19, 2004.

       As for fright and emotional injury, Captain Dabdoub testified that the evacuation was voluntary.  Moreover, the Braud plaintiffs have not identified any individual who evacuated their home in response to emergency responders going door-to-door which began at 8:31 a.m. on August 19, 2004.  As to the second evacuation call *via* Intrado system alert which followed, it commenced at 9:50 a.m. and concluded at 10:15 a.m.  Without question each class member will have to be deposed and present evidence as to whether they were home on the day in question, whether they evacuated or not and, if so, whether their evacuation was pursuant to a first responder's knock, an Intrado Alert call or other mode of notification.  Individual issues will likely predominate and include such topics as the evacuation destination of the individual (if he or she did in fact evacuate), when the individual returned home and how the individual was notified that he or she could return to his or her residence.  There was media coverage of the incident, notifications issued at different intervals and the evacuation perimeter was modified several times during the morning of August 19, 2004.  Undoubtedly, the Court will be forced to conduct a series of mini-trials to resolve issues of causation and damages.

       The case of *Bradford v. Union Pacific Railroad Company*, 2007 WL 2893650 (W. D.

Ark. 2007) cited by defendants is most closely analogous to this case, insofar as the "evacuation class" is concerned. *Bradford* involved an evacuation of a putative class of residents who allegedly were forced to evacuate their homes on account of a train derailment. The *Bradford* court determined that Rule 23(b)(3)'s requirements were not met because questions affecting individual class members would likely predominate the proceeding. The court explained:

> Each class member will have to present evidence that they were home on the Saturday in question and that they actually evacuated. Since this evidence will vary from individual to individual, the end result will be a series of mini-trials that will dominate the proceeding. Therefore, this Court finds that the predominance requirement under Rule 23(b)(3) has not been satisfied for this subclass.[76]

The case at bar militates even more strongly against certification because there was not one unified evacuation; therefore, individual issues will undoubtedly predominate the proceeding regarding evacuation.[77]

As to the business class (and assuming numerosity and adequacy which have not been demonstrated), individual issues will likely predominate. Defendants will be required to review financial records of each allegedly affected business to determine both causation and quantum. Therefore, the Court must conduct mini-trials as to each such business to determine both of the aforesaid issues.

---

[76]*Bradford v. Union Pacific Railroad Company*, 2007 WL 2893650 *16 (W. D. Ark. 2007)

[77]*See* Louisiana State Police Hazardous Materials Incident Report at p. 006 (noting that, at 8:31 a.m., "they [meaning emergency responders] are evacuating a block a round the spill")[Trial Exh. 17]; Intrado Report/Affidavit of Tom Collins (noting the emergency notification calls were completed in 19 minutes and 20 seconds between the times of 9:50 a.m [7:50 MT] and 10:15 p.m [8:15 MT]) [Trial Exh. 16]; New Orleans Fire Department Incident Recall at p. 5 (noting that at 10:36 a.m. the authorities determined that it "is not a big spill" and reporting at 11:18 a.m. "a smaller evacuation area")[Trial Exh. 15].

In *Castano,* the Fifth Circuit observed that under such circumstances involving a myriad of individual factors, an action conducted nominally as a "class action" would "degenerate in practice to multiple lawsuits separately tried."[78] The predominance of individual-specific issues relating to the plaintiffs' claims for damages would in turn detract from the superiority of the class action device in resolving the plaintiffs' claims.[79] In *Amchem Products, Inc. v. Windsor,*[80] the Supreme Court instructed:

> In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Reporter for the 1966 amendments cautioned: "The new provision invites a close look at the case before it is accepted as a class action...."[81]

The Supreme Court further recognized that although the predominance test is readily met in certain cases involving consumer or securities fraud or violations of anti-trust law, even when arising from a common cause mass tort or mass accident, cases are likely to present *significant questions* affecting individuals in different ways:

> Even mass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revisions of Rule 23 ... noted that "mass accident" cases are likely to present "significant questions, not only of damages but of liability

---

[78]*Castano*, 84 F.3d at 745 n. 19 (citing Fed. R. Civ. P 23 (advisory committee notes)).

[79]*See id.*

[80]*Amchem*, 521 U.S. 591, 117 S.Ct. 2231 (1997).

[81]*Id.*, at 2246.

and defenses to liability, ... affecting individuals different ways." And the Committee advised that such cases are "ordinarily not appropriate" for class treatment.[82]

As to manageability, the lack of it is a foregone conclusion. A finding of fault on the part of the class action defendants can only be likened to crossing a threshold. Thereafter, it is a virtual certainty that the proposed class action will degenerate into a series of liability jury trials addressing the predominate issues (*i.e.,* proof as to the requisite findings under Louisiana law as to individual class members including proximate causation, injury-in-fact, and damages). Plaintiffs provide this Court with no reasonable basis to assume that common issues of fault resolved *via* class verdict would not be revisited in the context of sure-to-follow individual trials as to liability.

Assuming *arguendo* that certification would grace the individual trials with some measure of judicial efficiency not otherwise realized, the problems of proof unique to each class member's case predicate to a finding of liability under Louisiana law will likely consume more judicial resources than certification will save. It is highly likely that individual-specific factors which figure into the determination of causation and damages will comprise a "significant" part of each individual's case. Moreover, defendants' conduct, while common, is but a minor part of each potential class member's case.[83] Suffice it to say, under the circumstances presented, the

---

[82]*Id.* at 2250 (citations omitted).

[83]*See In re Agent Orange Prod. Liability Litigation MDL NO. 381,* 818 F.2d 145, 165-66 (2nd Cir. 1987), *cert. denied, sub nom., Pinkney v. Dow Chemical Co.,* 484 U.S. 1004, 108 S.Ct. 695 (1988); and *Commonwealth v. Puerto Rico v. M/V Emily S.,* 158 F.R.D. 9, 15, 1995 A.M.C. 1025 (D. Puerto Rico 1994)(noting that even assuming success in establishing fault, claimant's still have the bulk of the case ahead of them, meaning injury in fact and causation).

net result is more likely a waste of judicial resources.[84]   Ultimately, the battle royale in this case

will be fought over causation and damages and then, on an individual basis.

Most recently, the Fifth Circuit recently examined the difficulties presented in treating

mass tort claims involving allegations of "emotional and other tangible injuries," like those at

issue here, as class actions under Rule 23.[85]   That case, *Steering Committee v. Exxon Mobil,*

*Corp.*, arose out of an August 8, 1994 fire at a Baton Rouge chemical plant.[86]  As the fire was

burning, the wind carried the smoke plume to the southwest and across the Mississippi River.[87]

Hundreds of suits were filed against Exxon Mobil alleging various causes of action including

claims for bodily injury, personal discomfort and annoyance, emotional distress resulting from

knowledge of exposure to hazardous substances, fear of future unauthorized exposures, and

economic harm including damage to business and property, among others.[88]  The district court

denied class certification which was affirmed on appeal by the Fifth Circuit on two grounds: (1)

the predominance requirement of Rule 23(b)(3) had not been satisfied because the nature of

Plaintiffs' claims, *particularly those that involved emotional and other intangible injuries,*

---

[84]*See Castano,* 84 F.3d at 749, n. 27 (citing *Sterling v. Velsicol Chemical Corp.*, 885 F.2d 1188, 1196 (6th Cir. 1988)(the Rule 23(b)(3) device "was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort and expense.").

[85]*See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir.2006).

[86]*Id.*

[87]*Id.*

[88]*Id.*

demonstrated that individual issues would predominate over any class issues;[89] and (2) a class action was not the superior mechanism to adjudicate the claims at issue.[90]

In the context of "predominance," the Fifth Circuit expressed skepticism about treating mass tort incidents as class actions. Individual issues of damages and causation which are inherent in mass tort actions almost invariably predominate over any issues common to the class. There is the rare instance where (1) causation is not in dispute and (2) damages are susceptible to formulaic calculation. In such cases involving mental distress and other intangible injuries, the Fifth Circuit determined that damages for such alleged injuries cannot be treated formulaically by the Court.[91] In *Steering Committee, supra,* the court observed:

> The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards.[92]

Plaintiffs direct the Court to *Turner v. Murphy Oil USA, Inc*. in support of class certification in the instant case.[93] The *Turner* case involved the claims of homeowners and

---

[89]The Fifth Circuit noted the district court's conclusion that "one set of operative facts would not establish liability and that the end result would be a series of individual mini-trials which the predominance requirement is intended to prevent." *Steering Comm. v. Exxon Mobil Corp*., 461 F.3d at 602.

[90]*Id.*

[91]*Id.*

[92]*Id.*

[93]*Turner v. Murphy Oil USA, Inc*., 234 F.R.D. 597 (E. D. La. 2006) (Fallon, J.).

business owners against Murphy Oil alleging damages as a result of an oil spill.[94]  The *Turner* court determined that certification under Rule 23(a) and 23(b)(3) was proper, and adopted the plaintiffs' proposed trial plan which, like that of the instant Plaintiffs, bifurcated the trial into liability and damage phases. *Id*.

The *Turner* court noted that while "[t]here will be some individualized inquiry regarding whether there is oil on a particular plaintiff's property, and whether that oil is crude oil from Murphy's refinery ... the predominant issues in the negligence inquiry will be centered on the scope of Murphy's duty, if any, to the Plaintiffs."[95]  The court's opinion further turned on the fact that certain elements of plaintiffs' alleged damages may be assessed on a class-wide basis.[96]

This case is distinguishable from *Turner* in significant part. One important difference is that the *Turner* court dismissed defendants concerns regarding the predominance requirement and argument that certain factual elements will require individualized inquiry, noting that any individualized inquiry would not be extensive due to the great factual similarities between the plaintiffs' claims and because the personal injury and mental anguish damages would not form a significant portion of the claims.  In the circumstances surrounding the oil spill in *Turner*, all or the great majority of plaintiffs were out of the area due to evacuations made necessary by Hurricane Katrina when the spill occurred.

In the instant case, unlike in *Turner*, Plaintiffs' mental anguish claims, particularly those for fear and fright, *are the predominant claims asserted.*  Additionally, the facts discussed above

---

[94]*Id.*

[95]*Id*. at 607.

[96] *Id.* at 607 n. 5 (Indeed, a real estate expert opined that the properties would be properly subject to mass appraisal to determine their present value.).

at the outset demonstrate a wide variation in the ways in which different claimants may have experienced the events surrounding the August 19, 2004 chemical release. It is apparent that various individuals were affected in different ways, *and some not at all*. Each of these factors, among others, must be considered for each individual in any determination of damages. Consequently, it is clear that this type of evaluation of each individual's experience on August 19, 2004 will predominate over any issues common to the class.

As a result, despite Plaintiffs' argument that the claims, such as those for fear and fright, in this case differ from the claims asserted in *Steering Committee v. Exxon Mobil Corp*., and as such, that the case is distinguishable, this Court finds the case controlling in the instant context. Plaintiffs herein are faced with many of the same problems inherent in *Steering Committee v. Exxon Mobil Corp*., including those detailed above relating to claims for mental distress and intangible injuries which cannot be treated formulaically by the Court.

This Court recognizes that the plaintiffs in Steering Committee also alleged claims for physical injuries resulting from exposure to toxic fumes, which required each individual plaintiff to satisfy his or her own burden of medical causation, and that such claims do not comprise a significant portion of the claims asserted by Plaintiffs herein. However, this difference does not force a finding that *Steering Committee* is otherwise inapplicable.

Based on the individualized nature of the claims asserted by Plaintiffs herein, the majority of which are seeking damages for mental distress and intangible injuries, this Court determines that the instant case falls closer to the *Steering Committee* end of the spectrum. Although the Court might be able to conduct a class-wide trial on certain common legal issues pursuant to Plaintiffs' proposed trial plan, such a limited-issue class action trial, which would still require

mini-trials to resolve issues such as specific causation and damages, would not be superior to the current procedural posture of the case, where all actions have been consolidated, and the matter can proceed to trial as to those plaintiffs who have a desire to proceed.

The Court further finds that the Fifth Circuit's recent decision in *Robinson v. Monsanto Co.*, 2008 WL 2787478 (5th Cir. July 18, 2008), is instructive. *Robertson* similarly involved injuries arising out of a single accident, specifically, a gas leak at the defendant's manufacturing plant. *Id.* The Fifth Circuit reversed the district judge's order granting class action status, concluding that the "issues of causation and damages are highly individualized, and thus would not be well-served by a class action." *Id.* at *7. The *Robinson* court explained that while the injuries did stem from a single incident, each plaintiff still must show that the defendant's negligence in causing the gas leak was proximately connected to the specific injuries complained of. *Id.* Citing its own precedent in *Steering Committee, supra,* the *Robinson* court particularly noted that the "emotional distress claims brought by the plaintiffs ... will require some form of individualized proceedings." *Id.* at *7.

Considering the foregoing discussion, the law, all of the evidence and in light of the analysis required by Rule 23, this Court has determined that the *Braud* plaintiffs' case is not suitable for class certification. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Class Certification as Supplemented (Rec. Doc. Nos. 65 and 93) is hereby DENIED.

New Orleans, Louisiana, this 22nd day of July, 2009.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE